16 P.3d 1 (2001)
142 Wash.2d 710
In the Matter of the PERSONAL RESTRAINT OF Darold J. STENSON, Petitioner.
No. 66565-6.
Supreme Court of Washington, En Banc.
Considered June 8, 2000.
Decided January 4, 2001.
*5 Ronald D. Ness, Judith M. Mandel, Ronald D. Ness & Assoc., Port Orchard, WA, for Petitioner.
Honorable Christopher O. Shea, Prosecuting Attorney for Clallam County, Lauren M. Erickson, Deputy, Deborah S. Kelly, Deputy, Port Orchard, WA, for Respondent. *2 *3
*4 GUY, C.J.
In a personal restraint petition (PRP) Darold J. Stenson asks this court to reverse his conviction and death sentence, which this court affirmed in State v. Stenson, 132 Wash.2d 668, 940 P.2d 1239 (1997), cert. denied, 523 U.S. 1008, 118 S.Ct. 1193, 140 L.Ed.2d 323 (1998). Petitioner Stenson claims he received ineffective assistance of counsel, which violates the Sixth Amendment because "the right to counsel is the right to the effective assistance of counsel." Strickland v. Washington, 466 U.S. 668, 686, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) (quoting McMann v. Richardson, 397 U.S. 759, 771 n. 14, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970)).
Petitioner's strongest claims are those which are supported by Ninth Circuit precedents interpreting the ineffective assistance of counsel test in Strickland. However, a close inspection of those precedents and later cases, and applying their reasoning to the facts of this case, lead to the conclusion that Stenson's counsel was not constitutionally ineffective. We deny Stenson's personal restraint petition as to all claims.

FACTS
On March 25, 1993, Stenson called "911" and stated: "`[T]his is D.J. Stenson at Dakota Farms.... Frank has just shot my wife, and himself, I think.'" Stenson, 132 Wash.2d at 677, 940 P.2d 1239. Stenson and his wife Denise lived at Dakota Farms, where they raised exotic birds. Id. "Frank" was Frank Hoerner, friend and business associate of the Stensons. Id. The police arrived to find Hoerner face down on the floor, dead of a gunshot wound with a revolver resting beside his hand. Id. Upstairs in the master bedroom lay Denise Stenson, wounded by a gunshot to the head; she died the next day. Id.
According to Stenson, he and his wife had dinner the night before with Hoerner and his wife, also named Denise. Id. At that time Stenson and Hoerner arranged that Hoerner would go over to Dakota Farms to sign some insurance papers for some ostriches which were to be purchased by Stenson for the two of them. Id. Stenson said Hoerner had invested over $30,000 in the Stensons' exotic bird business, and Stenson had told Hoerner he was going to Texas to pick up Hoerner's ostriches. Id. at 678, 940 P.2d 1239. Because Hoerner had to catch a ferry to go to work on the Seattle-side of Puget Sound, he would have to go to the Stensons' residence at 3:30 in the morning. Id. at 677, 940 P.2d 1239. Hoerner signed the papers in Stenson's *6 office located in a separate building behind the house. Id. at 678, 940 P.2d 1239. Stenson said Hoerner then left to use the bathroom in the house. Id. When Hoerner did not return, Stenson went to the main house to investigate. Id. He found him shot to death in the guest bedroom downstairs. Id. He heard moaning and went upstairs to find his wife shot and then called "911." Id. Stenson told the police that his three young children were asleep when their mother was shot and that he himself did not hear any gunshots. Id. Subsequent investigation indicated that Hoerner had probably been beaten unconscious by a blow to the head and then dragged into the house from the gravel driveway, through the laundry room, and shot in the head in the guest bedroom. Id. at 679, 940 P.2d 1239. The investigation showed spatters of Hoerner's blood in the driveway and in the laundry room; there was also a bloody fingerprint of Stenson's on the freezer in the laundry room. Id. at 679-80, 940 P.2d 1239. Stenson's jeans had spatters of blood on them, which were consistent with Hoerner's blood protein profile. Id. at 680, 940 P.2d 1239. Some of the blood spatters on the jeans were not the type of stains which could have been formed on the jeans after Hoerner was already on the floor. Id.
Later investigation also showed that Stenson was in financial difficulty. Id. Hoerner had given Stenson $50,000 toward the purchase of birds, but records showed that only one purchase of two birds worth $2,000 had been made from that investment. Id. Denise Hoerner testified that a month before his death, Hoerner had told Stenson he wanted the birds or his money back. Id. at 681, 940 P.2d 1239. The bank account of Dakota Farms showed a balance of approximately $3,400. Id. at 680, 940 P.2d 1239. The prosecution's theory of the case was that Stenson killed his wife to collect $400,000 in insurance money and killed Hoerner to get out from under the $48,000 he owed Hoerner and to blame him for Denise Stenson's murder. Id. at 681, 940 P.2d 1239.
Stenson was arrested on April 8, 1993 and charged with two counts of first degree aggravated murder. Id. On August 11, 1994, the jury found Stenson guilty of the crimes of premeditated murder in the first degree of Denise Stenson and Frank Hoerner. Id. at 682, 940 P.2d 1239; R. of Trial Proceedings (RTP) at 1853-63. On August 18, the jury found insufficient mitigating circumstances to merit leniency. R. of Death Penalty Proceedings (RDP) at 459.
After several weeks of jury selection, on July 13, 1994, the trial court held an in camera proceeding to hear Stenson's motion to substitute counsel or to proceed pro se. Stenson, 132 Wash.2d at 731, 940 P.2d 1239. At that hearing Stenson's lead counsel, Fred Leatherman, explained that the conflict between him and Stenson was over the tactics to be employed during the guilt phase of the trial. Id. at 730-31, 940 P.2d 1239. Leatherman said that his team felt the guilt phase was not "winnable" and that they did not want to do anything during the guilt phase to create problems for Stenson in the penalty phase. R. of Voir Dire Proceedings (RVP) at 3118. He did not want to alienate the jury. Id. at 3124. Stenson complained that Leatherman was not trying to help him prove his innocence and win his case. Id. at 3125. The trial strategy Stenson wanted Leatherman to employ was to put Denise Hoerner on trial and lay the crime at her feet. Id. at 3138. Leatherman countered that the dead man's widow would be a sympathetic figure and going after her would alienate the jury. Id. at 3124, 3139, 3146. Leatherman felt Stenson's strategy would not work in light of the compelling physical evidence suggesting that Stenson was the perpetrator, evidence which Leatherman recounted at length in the in camera proceeding. Stenson, 132 Wash.2d at 731, 940 P.2d 1239. Stenson also mentioned that he and Leatherman disagreed on other issues such as the questioning of other witnesses. RVP at 3148. On July 14, 1994 the trial court denied Stenson's motion. RVP at 3312.
On August 3, 1994, Leatherman made a motion to withdraw as trial counsel. Stenson, 132 Wash.2d at 742, 940 P.2d 1239. The trial court denied this motion. RTP at 1507.
On July 24, 1997, this court affirmed Stenson's convictions and the imposition of the death sentence. Stenson, 132 Wash.2d at 760, 940 P.2d 1239. The United States Supreme *7 Court denied certiorari on March 9, 1998. Stenson v. Washington, 523 U.S. 1008, 118 S.Ct. 1193, 140 L.Ed.2d 323 (1998). A first personal restraint petition was filed on April 7, 1998 and an amended version filed on April 29, 1999.

ISSUES
(1) Was there an actual conflict of interest or irreconcilable conflict between Petitioner and his counsel which adversely affected counsel's performance in violation of the Sixth and Fourteenth Amendments to the United States Constitution?
(2) Does a defendant have a Sixth Amendment right to determine trial tactics and the theory of defense?
(3) Did counsel's opposition to Petitioner's request for substitution of counsel violate Petitioner's Sixth Amendment right to effective assistance of counsel?
(4) Was Petitioner denied counsel at a crucial stage of the proceedings in violation of the Sixth and Fourteenth Amendments to the United States Constitution?
(5) Did counsel violate a fundamental duty to his client by not timely moving to withdraw from representation?
(6) Did counsel's decision not to call witnesses during the guilt phase of the trial violate the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution?
(7) Was counsel's failure to call witnesses to rebut the prosecution's claim that Stenson showed no grief deficient performance?
(8) Was counsel's failure to rebut the prosecution's negative presentation of the relationship between Stenson and his wife deficient performance?
(9) Was counsel's failure to present testimony regarding the profitability of Dakota Farms deficient performance?
(10) Did counsel's failure to propose a "lingering doubt" instruction violate Petitioner's Sixth Amendment right to counsel?
(11) Were Petitioner's Fifth Amendment rights violated when counsel made his penalty phase argument?
(12) Did Stenson receive ineffective representation when his counsel failed to offer other suspect evidence in the guilt phase?
(13) Was counsel's performance in preparing for testimony regarding Stenson's jeans deficient and ineffective?
(14) Was counsel's failure to personally interview and prepare for the testimony of Dr. Brady ineffective representation?

STANDARD OF REVIEW
"As a threshold matter, it is important to note that a personal restraint petitioner may not renew an issue that was raised and rejected on direct appeal unless the interests of justice require relitigation of that issue." In re Personal Restraint of Lord, 123 Wash.2d 296, 303, 868 P.2d 835 (1994) (citing In re Personal Restraint of Taylor, 105 Wash.2d 683, 688, 717 P.2d 755 (1986)). This burden can be met by showing an intervening change in the law "`"or some other justification for having failed to raise a crucial point or argument in the prior application."'" In re Personal Restraint of Gentry, 137 Wash.2d 378, 388, 972 P.2d 1250 (1999) (quoting Taylor, 105 Wash.2d at 688, 717 P.2d 755 (quoting Sanders v. United States, 373 U.S. 1, 16, 83 S.Ct. 1068, 10 L.Ed.2d 148 (1963))). A defendant may not recast the same issue as an ineffective assistance claim; simply recasting an argument in that manner does not create a new ground for relief or constitute good cause for reconsidering the previously rejected claim. In re Personal Restraint of Benn, 134 Wash.2d 868, 906, 952 P.2d 116 (1998). The petitioner may raise new issues, including both errors of constitutional magnitude and nonconstitutional errors, which constitute a fundamental defect and inherently result in a complete miscarriage of justice. Lord, 123 Wash.2d at 303, 868 P.2d 835 (citing In re Personal Restraint of Cook, 114 Wash.2d 802, 812, 792 P.2d 506 (1990)). In the context of constitutional error, a petitioner must satisfy his threshold burden of demonstrating actual and substantial prejudice. Cook, 114 Wash.2d at 810, 792 P.2d 506.
*8 The standard of review for ineffective assistance of counsel claims has been set forth in Strickland, 466 U.S. at 687, 104 S.Ct. 2052:
A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable.

DISCUSSION
As an initial matter, the State argues that Petitioner's claims under several issues are procedurally barred because they were all asserted in the Petitioner's direct appeal and rejected by this court in Stenson. State's Resp. at 2. In the State's view, Petitioner's arguments focusing upon the disagreements between Petitioner and lead counsel Leatherman, formerly cast as substitution of counsel issues on direct appeal, have returned in the PRP as ineffective assistance of counsel issues. Id. at 3. Rather than dealing with this procedural issue separately, we will discuss it whenever it becomes appropriate in our consideration of the merits of the issues.

(1)

Actual Conflict of Interest or Irreconcilable Conflict
Stenson contends that there was an actual conflict between himself and Leatherman due to differences in fundamental strategic choices. PRP at 13. Stenson wanted Leatherman to do everything he could to prove Stenson's innocence; Leatherman, after a certain point, felt Stenson had little chance in the guilt phase and concentrated his efforts on saving Stenson's life in the penalty phase. RTP 3118. Petitioner argues that Leatherman should have withdrawn when this conflict with his client's objectives became clear, and that Leatherman's failure to do so substantially prejudiced him before the trial court. PRP at 14.
The State counters that Petitioner confuses the concept of conflicts of interest with that of irreconcilable conflicts and breakdowns in communication. State's Resp. at 7. Petitioner's arguments and citations of legal authority do indeed concern conflicts of interest rather than irreconcilable conflicts. See PRP at 12-17. The phrase used by Petitioner, "actual conflict," appears to be shorthand for "actual conflict of interest," which, in Cuyler v. Sullivan, 446 U.S. 335, 350, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980), contrasts with a possible conflict of interest. A conflict of interest, however, does not appear to have been present in Stenson's case. Cuyler exemplifies one common kind of conflict of interest: where the conflict arises out of multiple representation. Id. at 335. Another kind of conflict of interest occurs where the attorney is accused of crimes similar to those of his client and where a vigorous defense might uncover evidence of the attorney's own crimes. Mannhalt v. Reed, 847 F.2d 576, 581 (9th Cir.1988). In Mannhalt the attorney's own interest conflicted with his client's. Petitioner conceives of his case as one in which his lawyer's personal interest conflicted with Petitioner's and cites RPC 1.7(b) in support of his argument. PRP at 14. Yet that provision, which states that a "lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests," largely concerns financial or familial interests, as shown by RPC 1.8. Case law does not support the application of the concept of a conflict of interest to conflicts between an attorney and client over trial strategy.
The State extensively briefed the alternative argument, characterizing the conflict in this case as falling within the category of irreconcilable conflicts. State's Resp. at *9 16-35. If the relationship between lawyer and client completely collapses, the refusal to substitute new counsel violates the defendant's Sixth Amendment right to effective assistance of counsel. United States v. Moore, 159 F.3d 1154, 1158 (9th Cir.1998) (citing Brown v. Craven, 424 F.2d 1166, 1170 (9th Cir.1970)). There are certain exceptions to the Strickland standard requiring a showing of prejudice in order to establish ineffective assistance of counsel. See Frazer v. United States, 18 F.3d 778, 785 (9th Cir. 1994). A defendant need not show prejudice when the breakdown of a relationship between attorney and defendant from irreconcilable differences results in the complete denial of counsel. Moore, 159 F.3d at 1158.
The State first argues that this issue need not be considered on its merits because it is procedurally barred. State's Resp. at 2-4. What was formerly a substitution of counsel issue has been recast as a claim of irreconcilable conflict causing ineffective assistance of counsel. Id. at 3-4. Because identical grounds for relief can be supported by different legal arguments or couched in different language, simply recasting an argument in that manner does not create a new ground for relief or constitute good cause for reconsidering a previously rejected claim. Benn, 134 Wash.2d at 906, 952 P.2d 116 (citing In re Personal Restraint of Jeffries, 114 Wash.2d 485, 488, 789 P.2d 731 (1990)). The Benn court rejected one of petitioner Benn's claims because he recast an issue of trial court error in admitting testimony and limiting cross-examination as an ineffective assistance claim. Benn, 134 Wash.2d at 905-06, 952 P.2d 116; State v. Benn, 120 Wash.2d 631, 648-52, 845 P.2d 289 (1993). However, a material intervening change in the law would constitute good cause to permit a successive petition under RAP 16.4(d). Jeffries, 114 Wash.2d at 488, 789 P.2d 731 (citing Taylor, 105 Wash.2d at 688, 717 P.2d 755).
On direct appeal Stenson raised the issue of whether the trial court erred in denying his motion for substitution of counsel. Stenson, 132 Wash.2d at 684, 940 P.2d 1239. In this court's analysis of the issue we said that a criminal defendant who is dissatisfied with appointed counsel must show good cause to warrant substitution of counsel, such as a conflict of interest, an irreconcilable conflict, or a complete breakdown in communication. Id. at 734, 940 P.2d 1239. We stated that the factors to be considered in deciding whether to grant a motion to substitute counsel are (1) the reasons given for the dissatisfaction, (2) the court's own evaluation of counsel, and (3) the effect of any substitution upon the scheduled proceedings. Id. (citing State v. Stark, 48 Wash.App. 245, 253, 738 P.2d 684 (1987)). We concluded that the denial of the motion for new counsel was not an abuse of discretion. Stenson, 132 Wash.2d at 737, 940 P.2d 1239. In a decision subsequent to Stenson, the Ninth Circuit Court of Appeals applied the test for assessing whether a trial court erred in failing to substitute counsel to the determination of whether an irreconcilable conflict exists. Moore, 159 F.3d at 1158 n. 3. The factors in the test are (1) the extent of the conflict, (2) the adequacy of the inquiry, and (3) the timeliness of the motion. Id. at 1158-59. Although the Ninth Circuit's irreconcilable conflict test covers some of the same ground as our test for substitution of counsel, the differences are substantial enough to constitute a new ground for relief. The Ninth Circuit's adoption of this test is a material intervening change in the law. Thus, although this court in Stenson found that the trial court did not err in denying Stenson's motion to substitute counsel, the change in the law represents good cause under RAP 16.4(d) to revisit the issue by applying the new test for an irreconcilable conflict as part of a determination of whether trial counsel was ineffective.
When inquiring into the extent of the conflict, the Ninth Circuit's precedents examine both the extent and nature of the breakdown in communication between attorney and client and the breakdown's effect on the representation the client actually receives. If the representation is inadequate, prejudice is presumed. In Brown the defendant went to trial with an attorney with whom he would not cooperate and with whom he would not, in any manner whatsoever, communicate. Brown, 424 F.2d at 1166. The Ninth Circuit found Brown's defense to *10 be "perfunctory" and stated that it would not be unreasonable to believe that had Brown been represented by an attorney in whom he had confidence, he would have been convicted of manslaughter rather than second degree murder. Id. at 1169-70. In United States v. Williams, 594 F.2d 1258, 1259 (9th Cir.1979), attorney and client were at serious odds for some time. In that case, the attorney-client relationship was a "stormy one with quarrels, bad language, threats, and counter-threats." Id. at 1260. The court found the facts of Williams indistinguishable from those in Brown. Id. In Frazer the actions of the attorney were so egregious that the court found the attorney's inappropriate eruption (verbally assaulting his client by using a racially derogatory term and threatening to provide substandard performance for him if he chose to exercise his right to go to trial) would be tantamount to a total lack of communication and make fatally suspect all advice following the outburst. Frazer, 18 F.3d at 783. In Moore the defendant and his counsel engaged in a serious argument when counsel failed to inform Moore of an important development in his case. Moore, 159 F.3d at 1159. Moore threatened to sue his attorney for malpractice. Id. The attorney later testified that on that occasion, he felt physically threatened by Moore. Id. The Court of Appeals accepted Moore's view that his attorney did nothing in a 68-day period leading up to trial except to interview Moore's son. Id. On the other hand, the United States Supreme Court held in Morris v. Slappy, 461 U.S. 1, 3-4, 103 S.Ct. 1610, 75 L.Ed.2d 610 (1983), that the Sixth Amendment does not guarantee a meaningful relationship between an accused and his counsel. The court in Frazer summarized the facts of Morris thus:[1]
In Morris, an indigent defendant had a unilateral falling out with his attorney caused not by any identifiable objective misconduct by the attorney, but by (1) [Slappy's] dissatisfaction with a switch from one public defender to another, (2) [Slappy's] opinion that the new public defender had not had enough time to prepare for trial, and (3) by the second public defender's assessment that [Slappy] had no "defense to [the] charges ." Because of this unilateral falling out, [Slappy] refused to participate in his own defense. In affirming the denial by the district court of [Slappy's] petition for a writ of habeas corpus, the Court rejected [Slappy's] claim that a defendant has the right to a certain "rapport" with his attorney.
Frazer, 18 F.3d at 783 (citations omitted). In Wheat v. United States, 486 U.S. 153, 159, 108 S.Ct. 1692, 100 L.Ed.2d 140 (1988), the Court stated that because the purpose of providing assistance of counsel is to ensure that criminal defendants receive a fair trial, the appropriate inquiry focuses on the adversarial process, not on the accused's relationship with his lawyer as such. The essential aim of the Sixth Amendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers. Id.
On May 3, 1993, David Neupert of the Clallam County Public Defender's Office was appointed to represent Stenson. PRP at 8; PRP, Attach. A at 1. On July 21, 1993, Al Lyon was appointed lead counsel, but on October 21, 1993, Lyon withdrew and Fred Leatherman was appointed to replace Lyon. PRP at 8; PRP, Attach. A at 1. Leatherman had been a criminal law attorney in Washington for almost 20 years and had extensive experience in death penalty litigation. Stenson, 132 Wash.2d at 730, 940 P.2d 1239. Although Neupert had been co-counsel on several homicide cases, he was not death-penalty qualified. Dep. of Neupert at 6, 16. At all times Neupert continued to represent Stenson. PRP, Attach. A at 1-2. On July 13, 1994, after more than 20 days of jury selection, the trial court held an in camera hearing on Stenson's motion to substitute counsel or to proceed pro se. Stenson, 132 Wash.2d at 730-31, 940 P.2d 1239. The trial court denied the motion. Id. at 733, 940 P.2d 1239. On August 3, 1994, 33 days after jury selection began, Leatherman made a motion *11 to withdraw as defense counsel. Id. at 742, 940 P.2d 1239. The court denied Leatherman's motion to withdraw because nothing the court had seen had raised concerns about the quality of representation given to Stenson. RTP at 1507.
Among other things, Stenson's July 12, 1994 motion requests the dismissal of both Leatherman and Neupert because of the breakdown of the attorney-client relationship between himself and his counsel. Def.'s Mot. to Continue Trial, Appoint New Counsel, or, in the Alternative, Allow Him to Proceed Pro Se at 1. At the July 13 in camera hearing, both Leatherman and Stenson described the source of the conflict between them as a dispute over trial strategy. Leatherman and Neupert had come to the conclusion that the guilt phase of the case could not be won and therefore did not want to do anything during the guilt phase which would create problems for the defense during the penalty phase. RVP at 3118. They had reached that conclusion because of the blood evidence, which both the State's and defense experts found inconsistent with Stenson's account of his activities. Id. at 3139. Leatherman felt that the tactical ploy urged on him by Stenson putting Denise Hoerner, Frank Hoerner's widow, on trial and trying to "lay this crime at [her] feet"would cause the jury to harden its opinion against the defendant and make them more likely to return a death sentence. Id. at 3119, 3132, 3138. From Stenson's perspective Leatherman did not fulfill his obligation to defend his client; Leatherman did not help Stenson prove his innocence. Id. at 3125. Stenson complained that Leatherman spent virtually no time preparing for the jury trial but concentrated instead on motions, jury selection, and the penalty phase. Id. at 3125-26. Stenson's attorneys refused to investigate things he and his family thought were important to the case. Id. at 3125. Leatherman became less and less positive toward Stenson; Neupert was initially positive, but that changed when Leatherman joined the team. Dep. of Stenson at 6-7. Stenson became frightened and irate. Id. at 19. He reports strong words were exchanged between himself and Leatherman. RVP at 3126. Stenson attempted to fire Leatherman twice, but was talked out of it; on the first occasion by his sister-in-law and on the second by Neupert. State's Resp., App. D, Stenson's Letter to Stacey (Letter to Stacey) at 1-2. Stenson repeatedly asked his attorneys to meet with him to keep him informed; he says Leatherman visited him in prison fewer than 10 times in 10 months. RVP at 3121. Stenson could never get through to Leatherman on the phone; Leatherman's office stopped receiving his calls. Dep. of Stenson at 22; RVP 3121.
On the other hand, at the in camera hearing, Stenson pronounced himself satisfied by the jury selection process to that point. RVP at 3120. Leatherman remembers that he and Neupert divided up their tasks and responsibilities; Leatherman worked on pretrial motions and the penalty phase, and Neupert was primarily responsible for the guilt phase, though he was supervised by Leatherman. Dep. of Leatherman at 8. Billing records, which Leatherman says are accurate, indicate that Leatherman visited Stenson 10 times between October of 1993 and January of 1994. Id. at 3132. Leatherman believes he met with Stenson on a regular basis but is unable to estimate the frequency of the meetings. Id. at 33. Neupert remembers that from November of 1993 to June of 1994, the period of time from the appointment of Leatherman to the trial, Neupert met with Stenson roughly twice a week. Dep. of Neupert at 22-23. Jeff Walker, investigator for the defense, worked solely on the guilt phase of the case with the objective of trying to acquit Stenson. Dep. of Walker at 23. Walker billed the county approximately $35,000 for his services. Id. Walker also witnessed the friction between Leatherman and Stenson, but said that such friction is almost routine in criminal defense work. Id. at 60-62. When Stenson was able to speak with Leatherman and Neupert, he said he had no trouble telling them things, but complained that nothing got done. Dep. of Stenson at 20-21. In denying Stenson's motion to substitute counsel, the trial court offered this evaluation of Leatherman's and Neupert's performance:
Competent counsel have been appointed to represent Mr. Stenson. There's nothing in the case to date that would give rise to *12 even the slightest suggestion that counsel has not been diligent, prepared or in any way acting other than in Mr. Stenson's best interest.
To the contrary, some six days of very complicated Frye hearings [Frye v. United States, 293 F. 1013 (D.C.Cir.1923) ], 21 days of jury selection, other days spent on briefing and argument on numerous substantive issues including motions to dismiss the special sentencing proceeding and other motions provide ample evidence that those attorneys appointed to represent Mr. Stenson are acting with diligence and professionally and vigorously on the defendant's behalf.
RVP at 3306-07.
On August 3, 1994, three weeks after the in camera hearing on Stenson's motion and 10 days into the trial, the trial court held another in camera hearing at Leatherman's request. The item which precipitated the hearing was an article appearing in that day's Sequim Gazette titled "Family Worried About Defense's Efforts During the Trial." RTP at 1500. Leatherman inferred that Stenson and at least one of his sisters had spoken with the reporter in order to complain about the conduct of defense counsel; Leatherman had advised Stenson not to speak with the press. Id. at 1501. As a result, Leatherman felt he did not have an attorney-client relationship with Stenson. Id. "I'm extremely frustrated with him to the point of really not wanting to go on with this case.... Quite frankly, I can't stand the sight of him." Id. The trial court pointed out that the article attributed statements to Stenson's family, not to Stenson. Id. at 1503. The court reiterated its earlier endorsement of counsel's performance: "It is still my finding that there is no evidence from which I could even begin to conclude that Mr. Stenson was not receiving very competent and professional counsel." Id. The court denied Leatherman's motion to withdraw and explained to Stenson that if the situation deteriorated, he would be free to make a motion to substitute counsel. Id. at 1504. Although afraid to proceed with his counsel and afraid to proceed without them, Stenson did not move to substitute counsel. Id. at 1506. Stenson expressed this view of his counsels' performance during the trial thus far: "Now as far as Mr. Leatherman and Mr. Neupert's trial tactics, as far as their technique and their expertise and their knowledge of how to conduct a trial and that and how to spar with Mr. Bruneau, they have been exceptional." Id. at 1505-06. Stenson continued to complain about a lack of communication and was upset that counsel had visited him only twice during the three-week duration of the trial. Id. at 1506.
The extent of the conflict between Stenson and his counsel does not appear to be comparable to those in the precedents from the Ninth Circuit; the effects of any breakdown in communication on attorney performance seem negligible. In Brown, 424 F.2d at 1169-70, the Court of Appeals found the representation given to Brown to be "perfunctory" and expressed the view that, had representation been better, Brown would have been convicted of a lesser-included offense. As a result of the conflict in Moore, 159 F.3d at 1158, Moore's attorney conducted only one interview in a 68-day period leading up to trial. Here, whatever the disagreements between Stenson and his counsel, Leatherman and Neupert (and there appears to have been no angry words exchanged between Stenson and Neupert), there is no evidence to suggest that the representation Stenson received was in any way inadequate. Although Neupert was assigned primary responsibility for the guilt phase of the trial (Dep. of Leatherman at 113), both attorneys participated in the guilt phase. The State presented 33 witnesses; of these, 25 were crossexamined, 15 by Neupert and 11 by Leatherman (one witness, called to testify more than once, was cross-examined by both counsel). The defense also called five witnesses of its own. Stenson himself expressed general satisfaction with the way his attorneys had conducted the trial. RVP at 3120; RTP at 1505-06. More specific allegations of ineffective assistance will be discussed later in this opinion. Hence, the judgment of the trial court, an examination of the record, and the words of Stenson himself indicate that the representation Stenson received was far superior to that suffered by the defendants in Brown and Moore.
*13 With respect to the extent and nature of the breakdown in communication, this case also does not approach the severity of the Ninth Circuit precedents such as Brown and Frazer, in which the breakdown was tantamount to a total lack of communication. Frazer, 18 F.3d at 783. Whatever lack of communication may have occurred between Stenson and Leatherman, Neupert visited Stenson twice a week. Dep. of Neupert at 22-23. Stenson agreed that he had no trouble talking with Neupert. Dep. of Stenson at 20-21. Stenson's major remaining complaint on this point is that he couldn't get Leatherman to return his phone calls. Given the other kinds of communication which did take place, Leatherman's failure is not a significant one.
At the August 3, 1994 in camera hearing on Leatherman's motion to withdraw, Leatherman did claim he no longer had an attorney-client relationship with Stenson. RTP at 1501. However, that specific breakdown did not last long. It was brought on by a newspaper article which appeared earlier on the day of the hearing. The trial court's denial of Leatherman's motion appears to have brought this particular rift to an end. Nothing in the record suggests it continued. The court invited Stenson to file at any time a motion to substitute counsel. RTP at 1504. Stenson declined to do so at that time or at any time during the trial. Stenson did petition the court for a mistrial on August 19, 1994, the day the judgment and sentence were handed down. PRP, Attach. C, Decl. of Darold J. Stenson at 2; J. and Sentence at 1-2. In that handwritten petition, however, Stenson did not renew his claim of a breakdown in communication but rather that Leatherman's performance was only minimally adequate. Stenson's Mot. for Mistrial at 1.
Because it does not appear that the extent of the conflict was very great or the breakdown in communication very severe, we do not discuss in any great detail the remaining factors in the Moore test for an irreconcilable conflict. The second factor is the adequacy of the trial court's inquiry into the breakdown. See Moore, 159 F.3d at 1158. Both Stenson and Leatherman were allowed to express their concerns at the July 13, 1994 in camera hearing. The depositions of Stenson, Leatherman, Neupert, and Walker, taken as part of the ineffective assistance inquiry, did not yield vital information beyond that already presented at the in camera hearing. The trial court's inquiry appears to have been sufficiently searching.
The third Moore factor is the timeliness of the motion for substitution of counsel. Moore, 159 F.3d at 1161. The defendant in Moore made several attempts to substitute counsel, the first over a month before the trial and the last still two weeks before the start of trial. Id. The court found both motions timely. Id. On the other hand, "where the request for change of counsel comes during the trial, or on the eve of trial, the Court may, in the exercise of its sound discretion, refuse to delay the trial to obtain new counsel and therefore may reject the request." Williams, 594 F.2d at 1260-61 (citing United States v. Price, 474 F.2d 1223 (9th Cir.1973); Good v. United States, 378 F.2d 934 (9th Cir.1967)). See also Moore, 159 F.3d at 1161. Although early on Stenson had twice considered "firing" Leatherman, he was dissuaded from bringing a motion to do so. Letter to Stacey at 1-2. When he did present such a motion, substitution of counsel would have necessitated impaneling a new jury and 21 days had already been spent selecting the jury in place at that time. Stenson, 132 Wash.2d at 736, 940 P.2d 1239. The trial court estimated a new attorney would need at least 30 days to review the case material and another 30 days to prepare adequately for a trial. RVP at 3311. Calling Stenson's motion for substitution of counsel untimely, the court denied it. RVP at 3302-03. The factor of timeliness weighs against the finding that an irreconcilable conflict existed.
After considering the three Moore factors, we find that there is no reason to believe that an irreconcilable conflict between Stenson and his counsel existed. The differences between defendant and counsel in this case do not come close to constituting denial of counsel to such an extent that prejudice may be presumed.

*14 (2)

Control Over Trial Tactics and Theory of Defense
Another of Petitioner's arguments should be considered here even though it was not fully briefed as a separate claim in the PRP: that a defendant has the right to control his own defense and that to the extent there was a conflict between Stenson and Leatherman regarding strategic choices, the wishes of the defendant should prevail. This argument underlies the entire PRP rather than supporting only one claim. Petitioner first raises this issue in his discussion of the conflict issue:
While a defendant is not entitled to a meaningful relationship with his attorney, Morris v. Slappy, supra, the Sixth Amendment requires that a defendant has the right to decide the type of defense that he wishes to mount and the right to an attorney whose actions are based upon the defendant's informed strategic choices. State v. Benn, 120 Wash.2d 631, 664, 845 P.2d 289 (1993) citing [I]n re Jeffries, 110 Wash.2d at 332-33, 752 P.2d 1338 (quoting Strickland, 466 U.S. at 691, 104 S.Ct. 2052).
Pet'r's Reply Br. at 5. See also PRP at 13 ("The Sixth [A]mendment requires that a defendant has a right to decide, within the bounds of permissible defenses, the type of defense he wishes to mount.") and at 14 ("The Sixth [A]mendment provides the defendant with a right to personally control his defense."). This sentence from the Reply is not quite an accurate paraphrase of the quotation from Strickland since it implies that that decision defined a constitutional right of a defendant to control his own defense. Strickland does not create such a right. The passage in question is part of an analysis of what constitutes effective representation and reads: "The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant." Strickland, 466 U.S. at 691, 104 S.Ct. 2052. The Court is inquiring into what is reasonable representation, not defining a defendant's right.
The United States Supreme Court, the Ninth Circuit, and this court have given counsel wide latitude to control strategy and tactics. In the appeals context, the Court has stated:
Neither Anders [v. State of Cal., 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967)] nor any other decision of this Court suggests, however, that the indigent defendant has a constitutional right to compel appointed counsel to press nonfrivolous points requested by the client, if counsel, as a matter of professional judgment, decides not to present those points.
....
For judges to second-guess reasonable professional judgments and impose on appointed counsel a duty to raise every "colorable" claim suggested by a client would disserve the very goal of vigorous and effective advocacy that underlies Anders. Nothing in the Constitution or our interpretation of that document requires such a standard.
Jones v. Barnes, 463 U.S. 745, 751, 754, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983). The Court later expressed similar views about representation at the trial court level:
Although there are basic rights that the attorney cannot waive without the fully informed and publicly acknowledged consent of the client, the lawyer hasand must havefull authority to manage the conduct of the trial.... Putting to one side the exceptional cases in which counsel is ineffective, the client must accept the consequences of the lawyer's decision to forgo cross-examination, to decide not to put certain witnesses on the stand, or to decide not to disclose the identity of certain witnesses in advance of trial.
Taylor v. Illinois, 484 U.S. 400, 417-18, 108 S.Ct. 646, 98 L.Ed.2d 798 (1988) (footnote omitted).
The Ninth Circuit has stated that "appointed counsel, and not his client, is in charge of the choice of trial tactics and the theory of defense." United States v. Wadsworth, 830 F.2d 1500, 1509 (9th Cir.1987) *15 (citing Henry v. Mississippi, 379 U.S. 443, 451, 85 S.Ct. 564, 13 L.Ed.2d 408 (1965) (counsel's deliberate choice of strategy is binding on his client)).
Washington law also affords trial counsel great leeway:
"We note, with increasing concern, that it seems to be standard procedure for the accused to quarrel with court-appointed counsel, or to develop an undertone of studied antagonism and claimed distrust, or to be reluctant to aid or cooperate in preparation of a defense. This appears to be done in order to argue on appeal that the accused was deprived of due process alleging he was represented by incompetent counsel."
State v. Piche, 71 Wash.2d 583, 589, 430 P.2d 522 (1967) (quoting State v. Keller, 65 Wash.2d 907, 908, 400 P.2d 370 (1965)). The Piche court went on to say:
To assure the defendant of counsel's best efforts then, the law must afford the attorney a wide latitude and flexibility in his choice of trial psychology and tactics. If counsel is to be stultified at trial by a post trial scrutiny of the myriad choices he must make in the course of a trial: whether to examine on a fact, whether and how much to cross-examine, whether to put some witnesses on the stand and leave others offindeed, in some instances, whether to interview some witnesses before trial or leave them alonehe will lose the very freedom of action so essential to a skillful representation of the accused.
Counsel is not, at the risk of being charged with incompetence, obliged to raise every conceivable point, however frivolous, damaging or inconsequential it may appear at the time, or to argue every point to the court and jury which in retrospect may seem important to the defendant; nor is he obliged to obtain a written waiver or instructions from the defendant as to each and every turn or direction the accused wants his counsel to take.
... For many reasons, therefore, the choice of trial tactics, the action to be taken or avoided, and the methodology to be employed must rest in the attorney's judgment.
State v. Piche, 71 Wash.2d at 590, 430 P.2d 522.
The courts have indicated that the decision to call or not to call a witness is for counsel to make. On the other hand, the opinions quoted above do not directly address the issue of whether counsel may employ, over the objection of the defendant, the tactic of admitting guilt during the penalty phase of a death penalty trial, an issue of great concern to Stenson. Pet'r's Reply Br. at 6. Apparently courts have not spoken to this issue: "General agreement exists that the decisions as to guilty plea, jury trial, appeal, defendant's presence at trial, and the defendant testifying are for the defendant, and that decisions on a substantially larger group of matters, such as objecting to inadmissible evidence, are for counsel." 3 WAYNE R. LAFAVE, JEROLD H. ISRAEL & NANCY J. KING, CRIMINAL PROCEDURE § 11.6(a), at 603 (2d ed.1999) (footnote omitted). This treatise does not list the decision we are concerned with here among the "substantially larger group of matters." The ABA guidelines are more helpful:
(a) Certain decisions relating to the conduct of the case are ultimately for the accused and others are ultimately for defense counsel. The decisions which are to be made by the accused after full consultation with counsel are:
(i) what plea to enter;
(ii) whether to waive jury trial; and
(iii) whether to testify in his or her own behalf.
(b) The decisions on what witnesses to call, whether and how to conduct cross-examination, what jurors to accept or strike, what trial motions should be made, and all other strategic and tactical decisions are the exclusive province of the lawyer after consultation with the client.
1 ABA, STANDARDS FOR CRIMINAL JUSTICE std. 4-5.2 (part) (2d ed. Supp.1986) (emphasis added). Although these standards are merely advisory, they do represent the Bar Association's judgment that the tradition of legal practice in this country has divided up the responsibilities between the attorney and client in the manner enumerated above: "As *16 established by the history of the criminal justice process and the rights vested in an accused under the Constitution, certain basic decisions have come to belong to the client while others fall within the province of the lawyer." Id. at Commentary. One can infer from the ABA standards that a decision to admit guilt during the penalty phase would fall within the exclusive province of the lawyer. Since Petitioner cites no authority for the proposition that the defendant should make such a decision, and given the wide latitude allowed to appointed counsel by the Supreme Court, the Ninth Circuit, and Washington law, this court has no basis upon which to find that a constitutional right of the Petitioner was abridged when his counsel made the decision at issue.

(3)

Counsel's Opposition to Petitioner's Request for New Counsel

(4)

Representation During the In Camera Proceeding
Petitioner's claims with respect to the third and fourth issues concern the in camera proceeding on July 13, 1994, near the end of the voir dire proceedings, to hear Stenson's motion to substitute counsel. Stenson, 132 Wash.2d at 731, 940 P.2d 1239. Petitioner argues that Leatherman's antagonistic position toward his request for substitute counsel violated his Sixth Amendment right to assistance of counsel. PRP at 15, 17. During the proceeding, Stenson was effectively without counsel, and because he lacked counsel at a critical stage of the proceeding, reversal of the conviction is required. PRP at 19. The State responds that Stenson was never without counsel because Stenson had two attorneys: Leatherman and Dave Neupert. State's Resp. at 8-9. Even if Leatherman's actions could have in effect terminated his representation of Stenson, the Petitioner always had Neupert. Moreover, Neupert and Leatherman assisted Stenson in preparing his motion for substitution of counsel. Dep. of Neupert at 29; Dep. of Leatherman at 27. Finally, the State attempts to distinguish the major case relied on by Petitioner:
United States v. Wadsworth, 830 F.2d 1500. State's Resp. at 37-40.
Wadsworth represents an important precedent because in that decision the Ninth Circuit reversed the trial court in circumstances similar to those in Stenson's case in which a hearing was held on a defendant's motion for substitution of counsel. Wadsworth, 830 F.2d at 1505. The court reversed for two different but related grounds. First, it accepted Wadsworth's argument that the district court abused its discretion in denying Wadsworth's request for the appointment of counsel following the court's order dismissing Wadsworth's counsel, Mr. Woolf, as the attorney of record. Id. at 1509. Second, the court also held that:
the proceeding conducted by the court on the defendant's motions resulted in the denial to the defendant of his right to due process and the right to counsel at that hearing. An accused is entitled to counsel at every critical stage of the proceedings against him. There can be no question that these proceedings were critical. At issue was the right of the defendant to have counsel at trial and time to prepare his defense.
Id. at 1510 (citations omitted).
The State argues that the holding of Wadsworth should be confined to what the Ninth Circuit itself described as the "unusual circumstances of this case." Id. at 1511. The trial court granted Wadsworth's motion to dismiss counsel, but refused his request that the court appoint him counsel. Id. at 1508. Wadsworth was also denied a continuance and was thus forced to represent himself at the trial, which began the day after the substitution of counsel hearing. Id. at 1506, 1508. Moreover, the Ninth Circuit found that Wadsworth's motion was justified because Woolf was unprepared for trial. Id. at 1510. Wadsworth was a "tax protester" who wanted to put on a defense challenging the constitutionality of the Internal Revenue Service. Id. at 1507, 1511. Woolf refused to put on such a defense and did not prepare an alternative; as he explained, "Well granted. I quit. You know, I just did nothing further. When I'm told I'm not wanted and I'm not going to represent him, I quit working on it." *17 Id. at 1508. Woolf even set another client's case for trial on the same day as Wadsworth's. Id. at 1510. Under those "unusual circumstances" the Ninth Circuit held that the district court should have suspended the proceedings and appointed an attorney for Wadsworth at the competency of counsel hearing as soon as it became apparent that Woolf "had taken an adversary and antagonistic position on a matter concerning his client's right to counsel and to prepare for trial." Id. at 1511.
The court stated that what Woolf could have done in order to carry out his professional responsibility to his client in a competent manner was to continue preparation of his defense on a defensible theory. Id. at 1510. If Wadsworth had then requested a substitution of counsel on the day of trial because of a disagreement on the theory of defense, the court could deny the motion and the trial proceed as scheduled. Id. This scenario represents what happened in Stenson's case. As both the trial court and this court found, there is no evidence to suggest that Leatherman failed to vigorously represent Petitioner. Stenson, 132 Wash.2d at 735-36, 940 P.2d 1239. Stenson and Leatherman disagreed on the theory of the defense, the Petitioner wanting to suggest that Denise Hoerner committed the murders and Leatherman refused to employ that strategy. Id. at 734-35, 940 P.2d 1239. Under those circumstances, the trial court denied Stenson's motion for substitution of counsel. The Ninth Circuit outlined a scenario in Wadsworth in which reversal would not be required due to the absence of counsel during the substitution of counsel hearing; the facts of this case appear to fit that scenario.
Subsequent Ninth Circuit cases involving substitution of counsel proceedings indicate that the failure of a court to appoint a separate counsel for the defendant at such proceedings is not per se a violation of his or her Sixth Amendment right to counsel. See United States v. Castro, 972 F.2d 1107 (9th Cir.1992); United States v. Moore, 159 F.3d 1154 (9th Cir.1998). In these cases the lack of separate counsel does not trouble the court.
Petitioner's claims with respect to the issues regarding counsel's antagonistic position toward the Petitioner's request for substitution of counsel and Petitioner's being denied counsel at a crucial stage of the proceedings are rejected because Wadsworth may be distinguished from this case. Petitioner was continuously represented by one cocounsel not in an adversarial position to him, and both counsel aided Petitioner in preparing his motion for substitution. The Ninth Circuit in Wadsworth supports the view that denial of substitution of counsel under the circumstances of Stenson's case is not a denial of a constitutional right to counsel.

(5)

Counsel's Fundamental Duty to Timely Withdraw
Petitioner's argument for this claim is interwoven with the arguments for a claim under the first issue. The "fundamental duty" referred to is not to violate RPC 1.7(b): "A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests ...." As we stated above in the discussion of the first issue, the `lawyer's own interest' denotes a financial or familial interest or an interest arising out of the lawyer's exposure to culpability. A disagreement over trial strategy between court-appointed counsel and his client does not violate the RPC. The RPC are consistent with the ABA Standards for Criminal Justice, which indicate that the kinds of decisions complained of here are `the exclusive province of the lawyer after consultation with his client.' 1 ABA, STANDARDS FOR CRIMINAL JUSTICE at 4-5.2. Contrary authority provided by Petitioner has been stricken.
In his letter to Stacey Storm, Petitioner claims that Leatherman told him he would not defend Stenson vigorously because Leatherman's religious convictions would preclude his being involved in a case in which his client could receive the death penalty. Letter to Stacey at 2-3. Such a claim, if credible, might rise to the level of a conflict of interest. However, the claim itself is not logically sound; if it were true, Leatherman should not have agreed to work on any death *18 penalty case. Second, Stenson's present counsel declined to make an issue of Leatherman's religious convictions; they neither briefed the issue nor inquired about them at his deposition. Finally, there does not appear to be any evidence on the record for this claim ("The Court: ... What I do not have before me is any indication that counsel have an ethical problem that precludes them from proceeding to represent you." RVP at 3318-19.) In a similar position is Stenson's claim that Leatherman and the judge arranged to keep Stenson's trial short because they did not want to cancel previously scheduled vacations. Letter to Stacey at 5.
We reject Petitioner's claim on this issue.

(6)

Counsel's Decision Not to Call Witnesses
This claim appears to be an overall claim which covers four claims under issues 7, 8, 9, and 14 of the remaining issues. PRP at 19-20.
Petitioner rephrases the argument of this claim thus: "Mr. Leatherman's decision to present Mr. Stenson's defense of innocence by cross-examination alone violated Mr. Stenson's right to effective assistance of counsel and his Fifth [A]mendment right to present affirmative evidence of his innocence." PRP at 19. The effective assistance prong of this claim will be considered by examining below each detailed claim. As for the second prong, there is no Fifth Amendment right to present affirmative evidence. As supported by Taylor v. Illinois, 484 U.S. at 417-18, 108 S.Ct. 646 and State v. Piche, 71 Wash.2d at 590, 430 P.2d 522, the decision to call witnesses rests with counsel, not with the defendant.
There is no Fifth Amendment violation. There may be a Sixth Amendment claims if counsel was ineffective according to the test set out in Strickland. Those claims will be discussed below.

(7)

Counsel's Failure to Call Witnesses to Rebut Claim That Stenson Showed No Grief
Petitioner contends that a major prosecution argument was that Stenson showed no signs of grief for his dead wife. PRP at 21-22, 24. In his final argument, the prosecutor recalled the testimony of the emergency medical technician who was attending the fatally shot Denise Stenson at the hospital. Id. at 22, 24. The technician was struck by the defendant's lack of grief. Id. at 24; RTP at 1786. Other instances of Stenson's lack of grief were also entered into evidence. PRP at 22. Petitioner complains that Leatherman did not call witnesses to rebut this evidence. A friend and two of Stenson's sisters were available to testify to the grief that Stenson exhibited. Id. at 22-24. Failure to call these witnesses, Petitioner claims, is ineffective assistance of counsel. Id. at 24. Leatherman himself admits that if he were to try the case again he would have presented evidence of Stenson's grief over his wife and of an affectionate relationship between Stenson and his wife. Dep. of Leatherman at 79-84.
In addition to the general overview of what constitutes ineffective assistance of counsel, an overview quoted in the standard of review section of this opinion, the Supreme Court in Strickland presents a more detailed discussion of the deficient performance prong and the prejudice prong. With respect to deficient performance, the defendant must show that "counsel's representation fell below an objective standard of reasonableness." Strickland, 466 U.S. at 688, 104 S.Ct. 2052. The Court did not set out detailed rules for reasonable conduct because "[a]ny such set of rules would interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions." Id. at 689, 104 S.Ct. 2052. Courts must be highly deferential:
Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable .... Because *19 of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that, counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action "might be considered sound trial strategy."...
The availability of intrusive post-trial inquiry into attorney performance or of detailed guidelines for its evaluation would encourage the proliferation of ineffectiveness challenges. Criminal trials resolved unfavorably to the defendant would increasingly come to be followed by a second trial, this one of counsel's unsuccessful defense.
Id. at 689-90, 104 S.Ct. 2052.
Even if a defendant shows that particular errors were unreasonable, the defendant must still show prejudice: that the error actually had an adverse effect on the defense. Id. at 693, 104 S.Ct. 2052. With respect to a death sentence challenge, "the question is whether there is a reasonable probability that, absent the errors, the sentencerincluding an appellate court, to the extent it independently reweighs the evidencewould have concluded that the balance of aggravating and mitigating circumstances did not warrant death." Id. at 695, 104 S.Ct. 2052. A court "must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent the errors." Id. at 696, 104 S.Ct. 2052.
Ninth Circuit decisions have added a further level of detail to the general guidelines provided in Strickland. Of particular interest in this case is the Court of Appeals decision in Kwan Fai Mak v. Blodgett, 970 F.2d 614 (9th Cir.1992), in which the Ninth Circuit affirmed a federal district court's reversal of the decision of this court in State v. Kwan Fai Mak, 105 Wash.2d 692, 718 P.2d 407 (1986). In Mak, the Ninth Circuit appears to enunciate a rule or guideline that counsel's failure to present important mitigating evidenceif there is no risk in doing socan constitute deficient performance within the meaning of Strickland. Mak v. Blodgett, 970 F.2d at 619. Mak was sentenced to death for killing 13 people. Id. at 616. Because essentially no mitigating evidence was presented during the penalty phase of his trial, the jury found that the state had proved the absence of mitigating factors and therefore sentenced Mak to death. Id. The Ninth Circuit began its analysis of the deficient performance prong of the ineffective assistance claim by pointing out the inexperience of trial counsel, three and four years out of law school and new to capital defense. Id. at 617. Their inexperience led to mistaken assumptions which resulted in their being compelled to commence the sentencing trial essentially unprepared only a few hours after return of the guilty verdict. Id. The only mitigating evidence presented was expert testimony questioning the reliability of the eyewitness' memory, and a copy of the jury verdict sentencing a codefendant to life without the possibility of parole. Id. Defense counsel failed to present any mitigating evidence regarding the defendant's background, family relationships or cultural dislocations that might have affected his behavior. Id. Substantial and important mitigating evidence was readily available, including testimony of family members to show Mak's human qualities and expert testimony to show the effects of cultural conflict on young Chinese immigrants. Id.
The Ninth Circuit noted that prior Supreme Court and Ninth Circuit cases had found the failure to present mitigating evidence was reasonable where the evidence was not presented for the tactical reason of not opening the door to damaging rebuttal evidence. Id. at 618. In Mak's case, there was no such risk. Id. at 619. Although counsel's errors were not as egregious as those in some prior cases, the Ninth Circuit agreed with the trial court that "[t]o fail to present important mitigating evidence in the penalty phaseif there is no risk in doing socan be as devastating as a failure to present proof of innocence in the guilt phase." Id. "Mak was depicted by the prosecution as a killing machine, and the defense presented no humanizing evidence whatsoever to offset that picture. Absent tactical *20 purpose or risk, such performance is deficient within the meaning of Strickland." Id.
In its consideration of the prejudice prong, the Court of Appeals applied the effect-on-one-juror approach since the law of Washington allows any one juror to set aside the death penalty. Id. at 621. The Ninth Circuit in Mak v. Blodgett declined to decide whether the facts of its case met the prejudice prong because of the cumulative effect of errors made by the trial court. Id. at 622. The court said the case before it fell somewhere in the middle of typical Strickland prejudice analysis because the proffered evidence was "far less exculpatory" in Mak than in those cases in which prejudice was found. Id. at 621-22 (emphasis added). There was no actual finding of prejudice or of ineffective assistance in Mak v. Blodgett; the presence of other errors made it unnecessary for the court to reach these issues.
A more recent Ninth Circuit case, Babbitt v. Calderon, 151 F.3d 1170 (9th Cir.1998), may be even more similar to Stenson's. The court declined to find either deficient performance or prejudice in this case. Babbitt claimed that counsel failed to investigate and present potentially mitigating evidence related to his tortured family history, his good deeds as a child, his learning disability, and his service in Vietnam. Id. at 1175. Babbitt says there was no strategic reason for excluding such evidence and his own counsel admitted that he did not adequately plan, research, or investigate. Id. The court, however, found that counsel did more that a mere cursory investigation. Id. at 1176. Counsel hired an experienced death penalty investigator who conducted a thorough investigation into Babbitt's history. Id. Counsel also made a substantial attempt to humanize Babbitt before the jury by calling family members and other witnesses who offered mitigating evidence of Babbitt's good character. The court, citing Mak v. Blodgett among others, stated that "[t]his case is therefore not even remotely similar to those where counsel completely failed to investigate or present mitigating evidence." Id. The Ninth Circuit concluded that Babbitt's counsel presented a constitutionally adequate penalty phase defense. Id. The court also determined that the defendant failed to show prejudice because the evidence not submitted was largely cumulative of evidence actually presented. Id.
Stenson's case more resembles Babbitt's than Mak's. Stenson had the benefit of a mitigation specialist, who had been employed in that capacity for eight years. RDP at 215. The specialist collected documents such as photographs and affidavits from witnesses who could not be present. Id. at 217. This collection was entered into evidence in a slightly redacted form. Id. at 294. A clinical psychologist testified that Stenson had problems with organizing and integrating material. Id. at 312, 316. In closing arguments, Leatherman concluded from this that "there's something wrong with [Stenson's] brain." Id. at 445. The crime itself showed that "his mind does not work properly." Id. at 446. The jury heard testimony from Stenson's mother, sisters, including the two who could have been asked about his displays of grief, friends, a pastor, and Denise Stenson's father. (The declarations of Wendy Cynkar and Twila Wentz, two of Stenson's sisters, use the phrase "[i]f I had been called to testify at the trial of Darold J. Stenson"; both actually testified at Stenson's trial. Decls. of Wendy Cynkar and Twila Wentz; RDP at 249, 370.)
Stenson's case resembles Mak's only in that Leatherman failed to present some mitigating evidence where there was no risk to the defendant. However, the attorneys in Mak's case presented almost no mitigating evidence at all. Like in Babbitt's case, Stenson received the benefit of a mitigation specialist. Counsel made a substantial attempt to humanize Stenson by presenting testimony from family members and other witnesses. A psychologist testified that Stenson suffered from a mental skills deficit. This court should be able to conclude, as did the Ninth Circuit in Babbitt, that "[t]his case is therefore not even remotely similar to those where counsel completely failed to investigate or present mitigating evidence," such as Mak. Babbitt, 151 F.3d at 1176. Leatherman's performance did not fall below an objective standard of reasonableness.
*21 With respect to prejudice, if the Mak court declined to find the deficient performance in his case to be prejudicial and judged it to be somewhere between clearly prejudicial and clearly not prejudicial, this court should find that the prejudice suffered by the Petitioner in this case, in which the counsel's performance is not constitutionally deficient, would be insufficient to affect the outcome. Mak v. Blodgett, 970 F.2d at 621-22.
Under the guidelines for ineffective assistance of counsel developed by the Ninth Circuit, Leatherman's failure to call witnesses to testify to Stenson's displays of grief does not constitute ineffective assistance. We reject Stenson's claim on this issue.

(8)

Counsel's Failure to Rebut Negative Presentation of Relationship Between Stenson and His Wife
Petitioner asserts that he was denied effective assistance of counsel to call witnesses to rebut the contention that he treated his wife like an object he controlled. PRP at 25. Petitioner cites two instances of damaging testimony. The first is from Denise Hoerner:
Q.... And did the defendant ever mention to you why it was that you had to go to the Stenson house rather than Denise Stenson visiting you at your home?
A. Yes. He told me just because my husband let me gallivant around town, he wasn't gonnathat his wifeher job was to be in the home and she was to stay there at the house.
RTP at 739-40. The second is from Linda Stocker, a bank lending officer:
A. [Denise Stenson] came outwell, after she joined the group and I was introduced to her then she asked if she could borrow his, his new pickup that was sitting there and takeshe wanted to take the kids and go to town was what she said.
Q. All right. What did the defendant say about this?
A. He said that yes she could take it but that if anything happened to his truck, she would be in a lot of trouble.
Q. And what did she do when she was told this? Did she say anything or what did she do?
A. She, she then disappeared from the group and went back into the house.
Q. Did you ever see her leave in the pickup truck?
A. No.
RTP at 389-90. Petitioner says that witnesses were available to testify that Denise Stenson did not have to ask her husband for permission to do anything. PRP at 26.
The State characterizes these two statements as relatively innocuous. State's Resp. at 51. The Stensons' relationship was a nonissue under the State's theory of the case. Id. at 50. Unlike its treatment of the Petitioner's lack of grief, the prosecution did not highlight this issue for the jury in its closing argument or anywhere else. Petitioner does not even raise the issue of, let alone argue for, prejudice. Therefore, Leatherman's failure to present rebuttal testimony on this point cannot be ineffective assistance of counsel because there has been no showing of prejudice to the Petitioner.

(9)

Counsel's Failure to Present Testimony Regarding the Profitability of Dakota Farms
The prosecution tried to establish through the testimony of Duane Wolfe, certified public accountant (CPA), that Stenson's bird farm business was not profitable. PRP at 27. Petitioner prepared a profit and loss estimate based upon the ostriches and rheas at the farm and industry projections for the income that would result from the sale of chicks and eggs. Id. James Morelli was available to testify that Stenson's income report was an overall accurate statement of the market for that year and that substantial profits would have been generated. Id. at 27-28. Petitioner concludes Leatherman's failure to call Morelli is deficient performance.
The State responds that the testimony of a witness who based his opinion on a report prepared by Stenson after he had been charged with murder would not effectively *22 rebut the testimony of an independent CPA. State's Resp. at 52. Morelli is married to Stacey Storm, a friend of Stenson's who testified on his behalf during the penalty phase of the trial. Id. at 53. Finally, Morelli would have testified to the projected income for Dakota Farms, not its current financial status. Id. at 54.
Petitioner also does not address the prejudice prong of the ineffective assistance of counsel inquiry. A greater showing would be required because, unlike claims under the two previous issues, a claim under the ninth issue relates to the guilt phase, not the penalty phase. In order to demonstrate prejudice, Petitioner would have to show how Morelli's testimony could have overcome the circumstantial evidence against Stenson. We reject this claim.

(10)

Counsel's Failure to Propose Lingering Doubt Instruction
According to Petitioner's PRP, Leatherman requested the court instruct the jury that lingering doubt is a mitigating circumstance, but the court failed to give the instruction. PRP at 28. Leatherman failed to register an exception to the court's decision. Id. Petitioner's own brief indicates counsel did not fail to propose the lingering doubt instruction, and thus Petitioner's claim on this issue misstates the facts. Moreover, as the State suggests, because Leatherman did propose it, there can be no ineffective assistance of counsel claim here. State's Resp. at 62. The State also correctly points out that Petitioner argues mostly that the trial court should have given the instruction and that this argument has nothing to do with the ineffectiveness of counsel. Id. at 62-63.

(11)

Penalty Phase Argument
Petitioner contends that his counsel's penalty phase argument that "we accept your verdict without reservation whatsoever" compromised Stenson's right to assert his innocence throughout the proceedings and violated his Fifth Amendment rights against self-incrimination. PRP at 36-38.
The privilege against self-incrimination, however, does not extend to the penalty phase. The Supreme Court has described the Fifth Amendment privilege against compelled self-incrimination as "the defendant's privilege to remain silent on the issue of guilt...." McGautha v. California, 402 U.S. 183, 213, 91 S.Ct. 1454, 28 L.Ed.2d 711 (1971) (emphasis added). In Crampton v. Ohio, a case together with McGautha, Crampton complained that under Ohio's single-trial procedure for death penalty cases, he could remain silent on the issue of guilt only at the cost of surrendering any chance to plead his case on the issue of punishment. Id. at 211, 91 S.Ct. 1454. The Supreme Court held that Ohio was not required to provide an opportunity for petitioner to speak to the jury free from any adverse consequences on the issue of guilt. Id. at 220, 91 S.Ct. 1454.
The holding in McGautha is not as important for Stenson's case as the Supreme Court's determination that the Fifth Amendment privilege relates to the issue of guilt. One can infer that the privilege does not extend beyond the determination of guilt. Any admission of guilt by Stenson or his counsel during the penalty phase after guilt had been assigned would not be a Fifth Amendment issue, but rather one of the right to counsel under the Sixth Amendment. This issue has already been discussed under issue one.
There is no Fifth Amendment right at issue in this claim.

(12)

Counsel's Failure to Offer Other Suspect Evidence
Petitioner wanted Leatherman to offer other suspect evidence but Leatherman refused; the "other suspect" Stenson wanted his guilt phase strategy to revolve around was Denise Hoerner, widow of one of the victims. PRP at 38-39. Although designated an ineffective assistance of counsel issue here, this issue in another guise was already decided in Stenson. There this court cited the rule that "[e]vidence connecting another person with the crime charged is not admissible *23 unless there is a train of facts or circumstances which tend clearly to point to someone other than the defendant as the guilty party." Stenson, 132 Wash.2d at 734, 940 P.2d 1239 (citing Lord, 123 Wash.2d at 316, 868 P.2d 835). After reviewing the record, this court concluded, "Nothing in the record before this Court, except for the unsubstantiated suspicions voiced by the Defendant, tends to point to anyone else as the murderer." Stenson, 132 Wash.2d at 734-35, 940 P.2d 1239.
In his PRP, Stenson cites to evidence not in the trial record which indicates that Denise Hoerner made statements concerning killing her husband. PRP at 39-41. However, this evidence has been stricken by a September 16, 1999 order of this court. Petitioner is left without any new evidence tending to show Denise Hoerner's guilt.
Even if the evidence were admissible, the facts of the case make it difficult to meet the burden of coming up with enough evidence to clearly point to Denise Hoerner as the guilty party. There is no evidence of any adult being present at Dakota Farms at the time of the murders other than Denise Stenson, Darold Stenson, and Frank Hoerner. Two of the adults had been shot in the head. Forensic evidence showed that the victim with a gun beside his head had probably been knocked unconscious before he was shot. The only other adult present was Stenson.
Finally, Leatherman did investigate the possibility that Denise Hoerner committed the crimes. Leatherman asked Jeff Walker, his investigator, to stake out her house and look into a possible boyfriend she may have had. Dep. of Leatherman at 55. Leatherman subpoenaed her bank records to see if the account might suggest that she hired a hit man. Id. at 55-56. He concluded there was no evidence. Id. at 56. Walker confirmed that there was no evidence to suggest that Denise Hoerner was the killer and that he had investigated the possibility fully. Dep. of Walker at 26.
Petitioner cites Ninth Circuit precedent in support of the position that the other suspect evidence in this case is admissible: "We start with the observation that `[f]undamental standards of relevancy ... require the admission of testimony which tends to prove that a person other than the defendant committed the crime that is charged.'" United States v. Crosby, 75 F.3d 1343, 1347 (9th Cir.1996) (quoting United States v. Armstrong, 621 F.2d 951, 953 (9th Cir.1980)). However, this rule determines what evidence is relevant; it does not require the admission of testimony barred by other rules of evidence, as is the case with the evidence stricken here.
There is no admissible evidence suggesting that Denise Hoerner committed the crimes. We reject this claim.

(13)

Counsel's Preparation for Testimony Regarding Stenson's Jeans
Petitioner asserts that Leatherman's performance in preparing for testimony regarding what Leatherman himself considered the most critical item of evidence, Stenson's jeans, was deficient. PRP at 51-52.
Although the pair of jeans was crucial evidence, prejudice must still be shown, not assumed. Petitioner argues that Leatherman's handling of expert witness Rod Englert was deficient. PRP at 48. A determination of whether performance was deficient need not be made because the State rightly observes that Englert was never called to testify and had no effect on the trial one way or the other. State's Resp. at 70. Prejudice to Petitioner has not been shown. Leatherman said that, after another lawyer had some unflattering things to say about Englert, Leatherman replaced him with another blood-spatter expert, Stewart James. Dep. of Leatherman at 37-38. The defense simply replaced one expert with another. According to Leatherman, all three experts, Englert, James, and prosecution witness Mike Grubb, reconstructed the crime in the same way. Dep. of Leatherman at 52.
Petitioner notes that Leatherman failed to cross-examine Grubb about the chain of custody of the jeans. PRP at 49. Petitioner implies that the chain of custody was handled in an improper manner. Id. Written testimony *24 from a witness who might have supported this claim has been stricken. The State cites Leatherman saying that the jeans were handled in the usual manner. State's Resp. at 71; Dep. of Leatherman at 97-98. Without more from Petitioner, deficient performance cannot be established here unless a lapse in the handling of evidence has been shown.
The final area of concern raised by Petitioner is that Leatherman failed to cross-examine Grubb on the importance of being able to microscopically examine the blood spots themselves rather than just using a photograph to reach an opinion as to the nature of the spots. PRP at 50. Petitioner's witness, Kay Sweeney, declares that one cannot confirm, without a microscopic examination, whether the spots of blood on Stenson's jeans were dripped blood or contact, transferred blood. Decl. of Kay Sweeney at 2.
But it is difficult to see why it matters whether the blood was dripped or transferred. Grubb testified at trial that it makes no difference:
Q. Mr. Grubb, your ultimate conclusion with regard to this case, that is, with regard to how that transferhow that blood got on the defendant's trousers, was what?
A. That contact with Mr. Hoerner or his surroundings as he was found at the scene does not explain those blood stains on the knee of the jeans; that they got there by some contact before Mr. Hoerner came to his resting position.
Q. Does that conclusion, is that your conclusion whether or not the spattering on those trousers is dripping blood or contact blood?
A. That's true. Either way. RTP at 1405-06.
Since Petitioner has not explained what may be gained by establishing that the blood was caused one way or the other, he has not shown how he was prejudiced.
We reject Petitioner's claim on this issue.

(14)

Counsel's Failure to Personally Interview and Prepare For the Testimony of Dr. Brady
Petitioner claims that Leatherman's preparation for examining Dr. William J. Brady, the medical examiner, was deficient. PRP at 54. Leatherman himself did not interview Dr. Brady but left it to his investigator, Jeff Walker. Id. Leatherman was unprepared when Dr. Brady testified that the wound to the head of Hoerner had been caused by a nunchaku, a martial arts weapon. Id. at 55. Leatherman did not anticipate such a conclusion because Brady had told Walker he could not tell that the wounds were inflicted by a nunchaku. Id. On the stand, Brady explained the discrepancy by saying that Walker had not shown him photos of nunchakus that had been shown him by the prosecutor at the time of his testimony. Id. The testimony is damaging to Stenson because he was a martial arts instructor who owned several nunchakus, which are wooden baton weapons. Stenson, 132 Wash.2d at 679, 940 P.2d 1239; RTP 481-83. Brady's testimony that Hoerner's head injury was caused by nunchakus would make it more probable that an expert in their use, Stenson, rather than a nonexpert, would use them. Although a nunchaku with Hoerner's blood on it was never found, there was an empty peg in the room in which Stenson's other nunchakus were displayed. PRP at 55-56; Stenson, 132 Wash.2d at 679, 940 P.2d 1239.
Leatherman's performance with respect to Dr. Brady was not deficient because it appears that Brady changed his story. Leatherman on crossexamination read what Brady had told Walker: "`Can I tell you if it's a nun-chu-ka? Damned if I know. Have I seen or been shown any photos which would line up? I have not."` RTP at 521. Brady responded, "That's right. I have not been shown any photos either then or now that would line them up. The photographs that we have seen today I, frankly, had not seen at the time that your investigator was down there." Id. Petitioner appears to argue that Leatherman should have interviewed Brady himself before trial and should have showed him pictures of nunchakus at the interview. PRP at 55-56.
What made Dr. Brady change from saying, "Damned if I know," when asked whether a *25 nunchaku caused Hoerner's injury to saying nunchakus were the weapon within a reasonable medical certainty? RTP at 521. Petitioner implies that Brady did not know what nunchakus were at the time of Walker's interview and that it was deficient performance not to have shown him photographs of them. But it is clear from the record that Brady had examined nunchakus at the murder scene. RTP at 481. Brady also appears to argue that the photographs of nunchakus shown to him by the prosecution make him medically certain they were the weapon. The photos "line up" with the wounds. It is not clear why photos of nunchakus are more informative of their properties than the nunchakus themselves. Leatherman's crossexamination of Brady did not go well because Brady was a difficult witness, not because of deficient preparation.
Petitioner says that the State's argument pointing to the empty peg on the wall and implying that the weapon used in the crime was kept there but now is missing could have been rebutted by the testimony of a witness who was not called. PRP at 56. The witness would have testified that he received a nunchaku from Stenson's martial arts room as a gift on his 18th birthday. Id. Yet that birthday was more than two years before the murders took place. Without more information, for example, that nunchakus are rare and that Stenson had to go to Japan to get them, this information would be of marginal exculpatory value. Stenson himself incorrectly remembers the time period between his giving the nunchaku and the gift as two months. Letter to Stacey at 13. The shorter time period is more supportive of Stenson's account, but also inaccurate.
Petitioner claims Leatherman should have called Mike Grubb to rebut Brady's testimony concerning the nunchaku. Pet'r's Reply Br. at 18-20. At Leatherman's deposition, Petitioner's counsel quoted from notes Leatherman made: "`Mr. Grubb had said the shape of the blunt trauma wound ( {a} rectangle with sharp corners) is not consistent in his opinion with nunchakus because it is too short and has four sharp corners. He believed some other type of object was likely responsible such as the butt end of a hatchet handle or something like that.'" Dep. of Leatherman at 128. Leatherman did not cross-examine Grubb on this point. Since he could have done so without any risk to his client, it may be deficient performance for him not to have done so.
However, Petitioner still must show prejudice. What he says is, "The issue of what weapon caused the injury to Frank Hoerner's head was critical as it related to Mr. Stenson's claim of innocence." Pet'r's Reply Br. at 20. Petitioner must show that there is a reasonable probability that, but for Leatherman's unprofessional error, the result of the proceeding would have been different. Strickland, 466 U.S. at 695, 104 S.Ct. 2052. This is a difficult burden because as far as the jury is concerned only three adults were at the murder scene. Two of them were dead. Evidence shows one dead person who appears to have committed suicide was actually murdered. Stenson was the only adult to have survived. Stenson had Hoerner's blood on his pants in areas inconsistent with finding Hoerner dead on the floor. In the abstract, the use of nunchakus incriminates Stenson because he knew how to use them. But in the context of the rest of the evidence, it makes little difference whether a nunchaku or a hatchet handle was used. The evidence still points to Stenson as the person who inflicted the injury.
Prejudice has not been shown. We reject this claim.
Issues briefed by the parties but not discussed in this opinion are duplicative, moot, or unsupported by admissible evidence.

CONCLUSION
Petitioner has been unable to show that the representation he received fell below the standard required by Strickland and cases from the Ninth Circuit Court of Appeals. We reject all of his claims alleging violations of his Sixth Amendment right to counsel. We also reject his other claims. We deny his petition.
SMITH, JOHNSON, MADSEN, ALEXANDER, TALMADGE, IRELAND, and BRIDGE, JJ., concur.
*26 SANDERS, J. (dissenting)
[A]n attorney who adopts and acts upon a belief that his client should be convicted "fail[s] to function in any meaningful sense as the Government's adversary."[1]
The belief in, and assertion of, one's own innocence is not a "trial tactic" which should be summarily discarded simply because counsel doesn't agree. Darold Stenson's right to protest his innocence is protected by no less than the Fifth Amendment right against self-incrimination. His right to effective assistance of counsel is guaranteed by the Sixth Amendment; if the relationship between lawyer and client completely collapses, the refusal to appoint new counsel violates that Sixth Amendment right. United States v. Moore, 159 F.3d 1154, 1158 (9th Cir.1998) (citing Brown v. Craven, 424 F.2d 1166, 1170 (9th Cir.1970)). A defendant need not show prejudice when an irreconcilable difference between attorney and client results in complete denial of counsel; it is presumed. Id.[2]
At its core, the conflict between Stenson and his attorneys was not simply about a theory of defense. Rather, it was a fundamental dispute over whether Stenson was entitled to protest his innocence, even at the expense of his life.[3] Stenson consistently proclaimed his innocence and wanted his trial conducted accordingly. Report of Proceedings (RP) (July 13, 1994) at 3124-25. His attorney disagreed, estimating Stenson's odds of acquittal as "one in a thousand at best," id. at 3124, and saying, "I will not be a party to a strategy that is going to result in his conviction and sentencing to death. I didn't sign on to this case to watch him commit suicide," id. at 3125. Thus, against Stenson's wishes, his attorneys essentially chose to bargain for his life in the penalty phase by forfeiting his innocence in the guilt phase preceding it. This judgment was much more than a trial tactic and, most importantly, was not for the attorneys to decide.[4]
The Sixth Amendment right to counsel "means more than just the opportunity to be physically accompanied by a person privileged to practice law," and "contemplates open communication unencumbered by unnecessary impediments to the exchange of information and advice." Frazer v. United States, 18 F.3d 778, 782 (9th Cir.1994) (citations omitted). Although the Sixth Amendment does not guarantee "a right to counsel with whom the accused has a `meaningful attorney-client relationship,'" Morris v. Slappy, 461 U.S. 1, 3-4, 103 S.Ct. 1610, 75 L.Ed.2d 610 (1983), "`to compel one charged with [a] grievous crime to undergo a trial with the assistance of an attorney with whom he has become embroiled in irreconcilable conflict is to deprive him of the effective assistance of any counsel whatsoever.'" United States v. Williams, 594 F.2d 1258, 1260 (9th Cir.1979) (quoting Brown, 424 F.2d at 1170)).
I. Application of the Moore Factors Demonstrates Irreconcilable Conflict
In Moore the Ninth Circuit applied the test for substitution of counsel to an attorney-client dispute and found the conflict to be irreconcilable. Moore, 159 F.3d at 1160. Application of the Moore test, (1) the extent *27 of the conflict; (2) the adequacy of the inquiry; and (3) the timeliness of the motion, demonstrates the irreconcilable conflict in this case warranted substitution of counsel.
A. Extent of Conflict
The conflict between Stenson and his attorneys started as early as January 1994 when Fred Leatherman called him a liar, causing Stenson to leave the meeting "[o]ut of sheer frustration." Personal Restraint Pet., App. C at 1. On two separate occasions during the following months Stenson told his attorneys he no longer wanted their representation, telling Leatherman in May that "his decision to not defend me in the guilt phase of the trial would be against my wishes." Id. On July 12, 1994 Stenson petitioned the court to substitute counsel or allow him to proceed pro se because of his concern that Leatherman "was not planning to defend me during the guilt phase of the trial." Id. at 2. During the July 13 in camera hearing, Leatherman stated:
It is Mr. Neupert's and my opinion ... that the guilt phase is not winable and we do not want to do anything during the course of the guilt phase which ... [would] prejudice Mr. Stenson's defense in the penalty phase.
Put another way, from the perspective of the lawyers, the only issue in this case is whether Mr. Stenson lives or dies. From the perspective of Mr. Stenson, the only issue that is important to him is whether he is acquitted or not."
RP (July 13, 1994) at 3118 (emphasis added). The irreconcilable nature of the conflict could not have been clearer yet the trial court denied Stenson's motion to substitute counsel and three subsequent requests to proceed pro se. Stenson, 132 Wash.2d at 764-65, 940 P.2d 1239 (Sanders, J., dissenting).
Two and a half weeks later on August 3 Leatherman himself petitioned the court to be removed as counsel, saying:
And I'm very concerned about the nature of the attorney-client relationship.
Right now I don't feel like I have an attorney-client relationship with Mr. Stenson. I'm extremely frustrated with him to the point of really not wanting to go on with this case.... Quite frankly, I can't stand the sight of him.
....
[T]he nature of my relationship with Mr. Stenson has been getting worse and worse and worse. To the point now where I don't think we are even communicating. I'm certainly not communicating with him and he's not communicating with me and we are heading in different directions on this case.
RP (Aug. 3, 1994) at 1501-02 (emphasis added).[5] Somehow the majority distinguishes this case from Brown and Frazer, saying the breakdowns there were "tantamount to a total lack of communication." Majority at 13. Since both parties here characterized the relationship as just that, a total lack of communication, it is unclear what more would be needed for this case to have risen to that level in the eyes of the majority. The conflict and lack of communication was so bad it made Stenson "afraid to go forward with them and [ ] afraid to go forward without them, too." RP (Aug. 3, 1994) at 1506. This was an irreconcilable conflict under the first Moore factor.
B. Extent of Inquiry
Despite the obvious and irreconcilable conflict, not to mention the express wishes of *28 both attorney and client, the trial court denied the motion to withdraw saying, "there is no evidence from which I could even begin to conclude that Mr. Stenson was not receiving very competent and professional counsel." RP (Aug. 3, 1994) at 1503 (emphasis added). The trial court went on to say that "competent representation" was required and "[t]hat's what's present." Id. at 1504. The majority justifies its decision by saying "whatever the disagreements between Stenson and his counsel ... there is no evidence to suggest that the representation Stenson received was in any way inadequate." Majority at 12 (emphasis added).
Both the trial court and the majority err by applying generalized standards of adequacy and competency as the measure of irreconcilable conflict between attorney and client. If mere adequacy were the standard, "whatever the disagreements between [a defendant] and his counsel," id., an attorney could, over the client's objection, convince a jury his client is guilty and get him convicted as long as the attorney does an "adequate" job of it.
The Ninth Circuit has found error in cases where the court focused on attorney competency rather than the actual conflict, saying "the proper focus of such an inquiry is on the nature and extent of the conflict between defendant and counsel, not on whether counsel is legally competent." United States v. Walker, 915 F.2d 480, 483 (9th Cir.1990), overruled on other grounds by United States v. Nordby, 225 F.3d 1053 (9th Cir.2000). The court also noted that, as in this case, the belief that legal incompetence was the basis of the complaint would only "demonstrate the inadequacy of the court's inquiry into the true cause of [defendant's] dissatisfaction." Walker, 915 F.2d at 483.
The majority goes so far as to call the effects of the breakdown in communication "negligible." Majority at 12. I can scarcely imagine such effects being negligible where (1) two convictions for first degree murder are at stake; (2) the penalty may be death; (3) the attorney and client disagree on whether the "only issue in the case" is the client's guilt and innocence or life and death; (4) the client asks for substitution of counsel or, in the alternative, to proceed pro se (several times); (5) the attorney doesn't feel like he has an attorney-client relationship, is not communicating with the client, can't stand the sight of him, doesn't want to go on with the case, and asks to be removed; (6) and the client is left in a position where he is afraid to go on with his attorney but also afraid to go on without him. Far from negligible, these circumstances begged for the appointment of new counsel. Both the majority and trial court's focus on competency serves only to "demonstrate the inadequacy of the court's inquiry into the true cause of [defendant's] dissatisfaction," and does not satisfy the inquiry into the nature of the conflict itself required under the second factor of the Moore test. Walker, 915 F.2d at 483.
C. Timeliness of Motion
Stenson filed his motion for substitution of counsel and alternative request to proceed pro se on July 12, 1994, two days before the jury was empaneled on July 14. Stenson, 132 Wash.2d at 730, 733, 940 P.2d 1239. The majority summarily dispenses with the third factor of the Moore analysis by saying the factor of timeliness "weighs against" finding irreconcilable conflict, Majority at 13, utterly ignoring the settled rule in the Ninth Circuit that a request to proceed pro se "is timely if made before the jury is empaneled, unless it is shown to be a tactic to secure delay." Moore v. Calderon, 108 F.3d 261, 264 (9th Cir.1997).[6]
The motion was clearly not a tactic to secure delay; Stenson had other attorneys who were immediately willing to take the case if appointed. Stenson, 132 Wash.2d at 733, 940 P.2d 1239. The delay caused by substitution would have been only the time needed for the new attorneys to review the case and prepare for trial. Majority at 13. This would have been a small imposition compared to the specter of facing a death *29 penalty proceeding represented by an attorney with an irreconcilable conflict. Because there is no evidence the motion was made to secure delay and the motion was timely made before the jury was empaneled, the third Moore factor militates for substitution of counsel.
Consideration of the three Moore factors reveals (1) an irreconcilable conflict and total breakdown of communication; (2) an inadequate and misdirected inquiry into the competence of the attorneys rather than the nature of the conflict itself; and (3) a timely motion for substitution of counsel that at most would have resulted in relatively minimal delay considering the import of the proceedings.
II. A Conflict of Interest Existed Which Deprived Stenson of His Right to Effective Counsel
The majority also completely dismisses Stenson's conflict of interest claim saying "[c]ase law does not support the application of the concept of a conflict of interest to conflicts between an attorney and client over trial strategy." Majority at 9. This is characteristic of the wrongheaded notion that counsel's behavior was merely a matter of strategy. In fact, the Ninth Circuit has joined the Tenth Circuit in holding an attorney may create a conflict of interest by abandoning the duty of loyalty[7]to his client:
"A defense attorney who abandons his duty of loyalty to his client and effectively joins the state in an effort to attain a conviction or death sentence suffers from an obvious conflict of interest. Such an attorney, like unwanted counsel, "`represents' the defendant only through a tenuous and unacceptable legal fiction." In fact, an attorney who is burdened by a conflict between his client's interests and his own sympathies to the prosecution's position is considerably worse than an attorney with loyalty to other defendants, because the interests of the state and the defendant are necessarily in opposition."
Frazer, 18 F.3d at 782-83 (emphasis added) (citation omitted) (quoting United States v. Swanson, 943 F.2d 1070, 1075 (9th Cir.1991) (quoting Osborn v. Shillinger, 861 F.2d 612, 625 (10th Cir.1988))).
Stenson is entitled to appointed counsel who does not, against his wishes, effectively concede his guilt as a matter of "strategy." By so doing, Stenson's counsel essentially joined the state in its effort to secure a conviction and "`utterly failed to "subject the prosecution's case to meaningful adversarial testing."'" Frazer, 18 F.3d at 782 (citation omitted) (quoting Swanson, 943 F.2d at 1074) (quoting United States v. Cronic, 466 U.S. 648, 659, 104 S.Ct. 2039, 80 L.Ed 2d 657 (1984)). Contrary to the majority's assertion that conflict of interest analysis does not apply to this case, Stenson's attorneys (for reasons I understand) deprived him of his right to adversarial representation contrary to constitutional guaranties.
III. Deprivation of the Right to Counsel at the In Camera Hearing
On July 13, 1994, the court considered Stenson's motion to substitute counsel or proceed pro se at an in camera hearing in which he was represented by the very attorneys he was trying to replace. Stenson, 132 Wash.2d at 731, 940 P.2d 1239.[8] The majority rejects Stenson's claim concerning the lack of representation at the July 13, 1994 in camera hearing "because Wadsworth[[9]] may be distinguished from this case." Majority at 17. The majority is disingenuous *30 in its portrayal of Wadsworth, selectively choosing a passage that suits its purpose and saying it represents what happened in Stenson's case. Majority at 17. Wadsworth does include a second alternative indicating substitution of counsel on the day of trial would not be allowed because of a disagreement on the theory of defense. Wadsworth, 830 F.2d at 1510. However, the majority does not mention the first scenario discussed, in which the court says:
[I]f the court determined that the disagreement had escalated to total breakdown in the attorney-client relationship, the court would have been required to dismiss counsel and appoint another attorney, after admonishing the defendant that the law did not permit an accused to control the theory of defense.
Id. at 1510. Contrary to the assertion of the Majority at 17, Wadsworth does not support its position in this case. In fact, Wadsworth requires the appointment of new counsel where a total breakdown in the attorney-client relationship has occurred. Id.[10]

CONCLUSION
The conflict between Stenson and his attorneys far exceeded any dispute about trial tactics or strategy. When both attorney and client complain the relationship has broken down to the point that there is no communication and unanimously ask for the appointment of new counsel, it is unclear whose interests are being served by denying their collective request. Certainly not the interests of justice, nor the interest that the constitutional rights of the accused be upheld at all cost.
I dissent.
NOTES
[1] The court mistakenly calls the defendant "Morris" instead of "Slappy." We correct the error in the passage below.
[1] Osborn v. Shillinger, 861 F.2d 612, 625 (10th Cir.1988) (quoting United States v. Cronic, 466 U.S. 648, 666, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984)).
[2] The deprivation of the right to counsel is so inconsistent with the right to a fair trial that it can never be treated as harmless error. Frazer v. United States, 18 F.3d 778, 782 (9th Cir.1994) (citation omitted) (citing Chapman v. California, 386 U.S. 18, 23 n. 8, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)).
[3] "Leatherman would attempt to save Stenson's life at the possible expense of allowing a finding of guilt. Stenson would contest guilt at the possible price of his life. The conflict could not be greater: it went to the very soul of the proceeding." State v. Stenson, 132 Wash.2d 668, 763, 940 P.2d 1239 (1997) (Sanders, J., dissenting) (emphasis added).
[4] The majority cites the American Bar Association guidelines to support its argument that strategic and tactical decisions are the province of the lawyer, Majority at 15, but ignores the fact that those same guidelines require the accused to decide what plea to enter. 1 ABA, Standards for Criminal Justice std. 4-5.2(a)(i) (2d ed. Supp. 1986). It follows that, where a defendant pleads not guilty and continues to protest his innocence, his lawyers should not be allowed to essentially concede his guilt by their defense.
[5] The majority blithely says the conflict is not comparable to Ninth Circuit precedent. Majority at 15. However, in Brown the court found sufficient conflict to require substitution where, as here, a defendant "was forced into a trial with the assistance of a particular lawyer with whom he was dissatisfied, with whom he would not cooperate, and with whom he would not, in any manner whatsoever, communicate." Brown v. Craven, 424 F.2d 1166, 1169 (9th Cir.1970). Furthermore, in Williams the defendant was deprived of his right to counsel due to the "state of disagreement, bad relationship, and lack of communication." Williams, 594 F.2d at 1260. As in this case, rather than denying the conflict "the response of counsel tended to confirm that the course of the client-attorney relationship had been a stormy one with quarrels, bad language, threats, and counterthreats." Id. Similarly in Moore, an irreconcilable conflict existed where the defendant testified he and his attorney "don't have any communication at all." United States v. Moore, 159 F.3d 1154, 1159 (9th Cir.1998).
[6] This is also the express rule of the Second Circuit, United States v. Walker, 142 F.3d 103, 108 (2d Cir.1998); the Seventh Circuit, United States v. Johnson, 223 F.3d 665, 668 (7th Cir. 2000); and the Tenth Circuit, United States v. Akers, 215 F.3d 1089, 1097 (10th Cir.2000).
[7] I do not question for an instant that Mr. Leatherman was motivated solely to save the life of his client and that he could not have been more "loyal" to his client's interests in that sense. However, ultimately there are some decisions reserved to the client, even when his lawyer honestly, and completely, believes the client fails to promote his self-interest in the best possible fashion.
[8] The majority weakly asserts that Neupert continued to represent Stenson even if Leatherman did not. Majority at 17. The record is devoid of support for this contention (and the majority offers none), and it flies in the face of Leatherman's comments during the in camera proceeding indicating that he was the ultimate decision maker and that Stenson disagreed with "Mr. Neupert's and my opinion" as "the lawyers." See RP (July 13, 1994) at 3117-20.
[9] United States v. Wadsworth, 830 F.2d 1500 (9th Cir.1987).
[10] Wadsworth also refutes the majority's assertion that Stenson was represented because "both counsel aided Petitioner in preparing his motion for substitution." Majority at 17. Wadsworth requires substitution of counsel where the disagreement has escalated to a total breakdown in the relationship even in a scenario where counsel has "filed a timely motion for a substitution on behalf of his client...." Wadsworth, 830 F.2d at 1509-10.