
IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 36837-8-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| VERA MARIE HAMILTON, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

SIDDOWAY, A.C.J. — Vera Hamilton was convicted following a jury trial of rendering criminal assistance, making false or misleading statements to a public servant, possession of a stolen firearm, and third degree possession of stolen property. She challenges the sufficiency of the evidence to support each charge. In a pro se statement of additional grounds (SAG), she raises over 20 additional issues.

Because the evidence was sufficient and her SAG presents no error or abuse of discretion, we affirm.

No. 36837-8-III
*State v. Hamilton*

FACTS AND PROCEDURAL BACKGROUND

Late in the afternoon of November 20, 2018, Ferry County Deputy Sheriff Matthew Kersten was on patrol and responded to a report of a fight in progress at Vera Hamilton's rural property. Deputy Kersten stopped his car outside the property's gate when he saw someone running from the scene whom he believed might have been involved in the fight. He briefly gave chase to the fleeing individual, but the individual did not stop. The deputy abandoned the chase when he heard people yelling from the Hamilton property, "[H]e's over here and he's getting in your vehicle." Report of Proceedings (RP) at 299. As Deputy Kersten returned to secure his patrol car, he heard gun shots coming from the direction of the individual who fled.

Deputy Kersten found a beaten, bloodied victim of the fight, Todd Griffith, standing by the closed passenger side door of his patrol car. The deputy drew his weapon and told Mr. Griffith to show his hands. Mr. Griffith complied, and Deputy Kersten handcuffed him and put him in the police car for safety before questioning members of Vera Hamilton's family who were standing nearby.

Present in the front yard were Ms. Hamilton, her 17-year-old daughter, "Delilah," and her 14-year-old son, "Porter."[1] By this time, Sergeant Talon Venturo had arrived and

---

[1] Pseudonyms are used to protect the teens' identity, consistent with a general order of this court. *See* Gen. Order of Division III, *In re the Use of Initials or Pseudonyms for Child Victims or Child Witnesses* (Wash. Ct. App. June 18, 2012), https//www.courts.wa.gov/appellate_trial_courts/?fa=atc.genorders & div=III.

2

he joined as Deputy Kersten questioned them. Deputy Kersten asked the Hamiltons, "[W]ho did this to this man?" RP at 564. Ms. Hamilton and Delilah told the officers the fight had been between Mr. Griffith and his friend. Ms. Hamilton told Deputy Kersten that Mr. Griffith had made rude sexual comments to Porter. Delilah told the deputy that Mr. Griffith had kicked her. She said she was not injured, and the deputy saw no sign she had been injured. Ms. Hamilton told Deputy Kersten that the man who ran away had "saved [them]," which the deputy understood to mean saved them from Mr. Griffith's objectionable statements and kicking. RP at 470-71.

Ms. Hamilton said that before the fight Mr. Griffith and his friend had been shooting a firearm. Deputy Kersten asked where the gun was and Ms. Hamilton said, "[H]e has it," pointing in the direction of the individual, now identified as Mr. Griffith's friend, who had fled. RP at 392. When the deputy asked for the identity of the friend, Ms. Hamilton said she didn't know his name. She said she had heard him referred to as Shane or Shawn. Porter would later testify that his mother gave the deputy two other possible names: Michael, and another, which he was "pretty sure . . . was either Cameron or Jesse." RP at 565.

In fact, the individual who had been shooting with Mr. Griffith and then assaulted him, causing his injuries, was Shane Malotte, Delilah's boyfriend, who Porter would later admit had been living with Delilah at Ms. Hamilton's home for a month. Porter believed that the boyfriend might go by Shawn (he thought that was Mr. Malotte's brother's or

3

dad's name) but he and everyone else in the family always referred to him as Shane. Porter testified that the boyfriend never went by Michael, Cameron or Jesse.

Porter would also later testify to a brutal beating of Mr. Griffith by Mr. Malotte that ended when Deputy Kersten's patrol car was seen approaching. At that point, Mr. Malotte took the gun they had been shooting—an SKS assault rifle that belonged to Mr. Griffith's grandmother—and ran. Porter testified that he and Delilah also told Deputy Kersten that the fleeing man was Mr. Griffith's friend, whose name they did not know. Porter admitted that in truth, they all knew Shane's first name, but did not provide it "because Shane asked s [sic] not to say anything." RP at 566.

Deputy Kersten asked Ms. Hamilton if she knew where Mr. Griffith's friend lived. She said it might be at Mr. Griffith's home.

Deputy Kersten spoke to the three Hamilton family members for 20 or 30 minutes. He left written statement forms with Ms. Hamilton, telling her that statements would be important to his investigation.

Deputy Kersten and Sergeant Venturo also spoke with Mr. Griffith, trying to get an identification of the person who fled the scene, but he was in poor condition and did not say. Sergeant Venturo described Mr. Griffith as "out of it" and not wanting to talk about anything. RP at 489. Mr. Griffith's eyes were swollen shut, his lip was lacerated, there were multiple contusions on the back of his head, and his face, hands, and shirt were covered in blood.

4

After leaving Ms. Hamilton's property, Deputy Kersten, Sergeant Venturo, and Deputy Christine Clark, who arrived late and had taken a position of cover outside the fence, traveled to the Griffith residence, acting on Ms. Hamilton's information that the man who fled could be there. They decided against approaching the home because it was dark and the fleeing man had an assault rifle—circumstances that called for more support. Also, Mr. Griffith was still in their custody, and they did not usually expose civilians to that kind of risk.

Mr. Griffith had refused offers to summon or take him for medical care, so the officers took him to the county jail to process his arrest for fourth degree assault, for allegedly kicking Delilah. Given his injuries, the jail would not accept him, so the officers took him to the hospital, "un-arrested him," and told him they would be in contact. RP at 492.

Thereafter, Deputy Kersten used social media in an effort to find a "Shane" or "Shawn" that might be the person who shot at him. On Facebook, he found a "Shane Malotte" who was a member of a local Ferry County page and was friends with, or had friends in common with, Ms. Hamilton and Delilah. Mr. Malotte had a shaved head and his Facebook posts contained Nazi symbolism. After learning that Mr. Malotte had previously been arrested, Deputy Kersten obtained a mugshot and included it in a photo array that he presented to Mr. Griffith. Mr. Griffith identified Mr. Malotte as the person who assaulted him.

5

Several days later, on November 25, Ms. Hamilton called 911 to report a trespass: that Mr. Griffith had returned to her property to try to get his truck, which had been left behind when he was taken to the hospital following the assault. Ms. Hamilton told the 911 operator that Mr. Griffith was accompanied by a man who "look[ed] exactly like the person who had shot at [the deputy]." RP at 325. Deputy Kersten and Sergeant Venturo responded to the call. Mr. Griffith and his companion had left by the time they arrived. They spoke with Ms. Hamilton, who repeated that the man who was with Mr. Griffith "matched the exact description" of the shooter. RP at 326. She told the officers she was "terrified" on seeing Mr. Griffith and his companion, and believed she had seen the flash of a gun out the window as they drove away. *Id.*

By this time, as Porter would later admit and testify at trial, Mr. Malotte was back in the Hamilton home. According to Porter, Mr. Malotte had returned sometime between midnight on the night of the assault and 4:00 the next morning.

During the November 25 contact, Deputy Kersten again asked Ms. Hamilton what she knew about the shooter, telling her it was "critical because he had shot at me and because he had beat up Todd. I mean he had assaulted Todd in a pretty significant way." RP at 327. Ms. Hamilton again told the officers that all she knew was that the man was Mr. Griffith's friend. That day and the next, Deputy Kersten asked Ms. Hamilton if the written statements he had requested were completed, and both times she said they were not.

6

That same day, Mr. Griffith reported to police that personal property was missing from his truck. He traveled to the police station the next day to provide a statement.

Deputy Kersten relied on Mr. Griffith's stolen property report to obtain a warrant to search Ms. Hamilton's residence for the missing items. Deputy Kersten and several other officers executed the warrant on November 29. Mr. Griffith had reported that among property missing from his truck were a snatch block, come-along, some tie straps and the SKS assault rifle. In executing the warrant at the Hamilton home, Deputy Kersten found the SKS rifle "right at the top of the stairs." RP at 332. He would later testify that "[t]here was a little banister and right around the corner of the banister it was lying on the ground," on top of a pile of clothing. RP at 332. The rifle's stock was emblazoned with a swastika and the words "skin head." RP at 341.

A double-doored storage area was built into the front of Ms. Hamilton's house. On the day of the search, its doors were open. Inside it officers found a snatch block and come-along hung on a water tank. Yellow straps of the type reported stolen were found on the ground. According to Deputy Kersten, anyone who walked up to the front side of the house could have seen these items. Mr. Griffith later identified the stolen straps, snatch block, and come-along as his. He and his grandmother identified the rifle as the grandmother's, although the swastika and "skin head" markings were new.

No one had been at the Hamilton home when officers arrived to execute the search warrant. After completing the search, they learned that a quad (an all-terrain vehicle) that

Ms. Hamilton and Porter were known to drive was parked near the highway. They located the quad at an intersection that serves as a community resources bus stop. While they were there, a bus stopped as if to let someone off, but then left without anyone disembarking. Deputy Kersten stopped the bus, found that Delilah and Mr. Malotte were on board, and arrested them. Mr. Malotte, Delilah and Ms. Hamilton all later faced charges.

The State originally charged Ms. Hamilton with first degree assault as principal or accomplice, as well as making false or misleading statements to a public servant, first degree rendering criminal assistance, possessing a stolen firearm, and third degree possessing stolen property. It dropped the assault charge before trial. Its amended information stated that the false or misleading statements to a public servant were alleged to have been made on November 20. It stated that the rendering criminal assistance was alleged to have occurred on or about November 25.

At Ms. Hamilton's trial, the State offered testimony from Mr. Griffith, Porter, Deputy Kersten, Sergeant Venturo, Deputy Clark and a 911 operator. They testified consistently with the facts recounted above.

Mr. Griffith provided detailed testimony about the events of the afternoon of November 20. He testified he had been drinking that day and drove to Ms. Hamilton's house midafternoon because he was bored. He took a bottle of alcohol with him. He testified that he visited outside with Ms. Hamilton, Delilah, Mr. Malotte and Porter, and

he and Mr. Malotte had a drink.  He testified that he had met Mr. Malotte only once before, when he and Mr. Malotte accompanied Ms. Hamilton on a drive to a smoke shop for cigarettes and "dinked around . . . for a little while" before Mr. Griffith was dropped off to walk home.  RP at 199.  As the group visited outside Ms. Hamilton's home on November 20, Mr. Griffith mentioned that he had his grandmother's SKS assault rifle in his truck.  Everyone but Ms. Hamilton took a turn shooting it.

After shooting, they continued visiting and drinking.  Mr. Griffith, who described himself as having a "crude sense of humor," recalls making a joke about kicking Delilah in the stomach when someone said she might be pregnant, and recalls "nudg[ing] her" with his foot.  RP at 210, 245.  He also joked about Porter "blow[ing]" a man for money and might have grabbed Porter's head and shoved it into his crotch.  He recalled Ms. Hamilton "freaking out" and yelling at him not to talk to people like that.  RP at 213-14.

His recollection of how it went from that to what he referred to as "lights out" was poor.  RP at 213.  He recalls being on the ground and trying to get up and "[t]hey were telling me to lay, you know, get down on the ground, you know, kicking me in the face and hitting me in the head with the butt of the gun telling me to stay down."  *Id.*  He knew they were hitting him with the gun because he could hear the "clinging" of the bolt, which made a distinct sound.  RP at 215.  Mr. Griffith believed Mr. Malotte was the one kicking him and "[h]e was the one with the gun anyways."  RP at 215.  He was pretty

sure everyone was outside while this was happening. When the police arrived, Mr. Griffith remembered thinking "thank God." RP at 218.

Porter testified that he and his mother were inside when what he referred to as "the actual fight" began between Mr. Malotte and Mr. Griffith. RP at 555. He went outside three or four times during their fight. At first, he testified, Mr. Malotte was punching Mr. Griffith, "and then he started kicking and when he was kicking he had steel toed boots on." RP at 559. Porter testified he was going out "to make sure like [Mr. Malotte] wasn't about to kill him because I was like really scared for T.J." RP at 558. (Mr. Griffith went by "T.J." as well as "Todd.") Porter testified that Ms. Hamilton was outside for part of the fight and Delilah was outside for most of it. Eventually, Ms. Hamilton called the police and Delilah talked to them.

Porter testified that he was not sure whether Mr. Malotte had the Griffith rifle when he returned to the house the night he assaulted Mr. Griffith and fled. But he saw it in Mr. Malotte's possession the next day. He testified that Mr. Malotte bought ammunition for the rifle and "was always messing with it, upstairs and downstairs." RP at 707. According to Porter, Mr. Malotte mostly kept the rifle upstairs; when he had it downstairs, it was in his hands. Porter did not trust Mr. Malotte with the gun and knew he should not have it.

Porter never handled the gun and he had seen Delilah hold only the clip. When asked at trial if he had seen his mother holding the gun after November 20, Porter

10

answered, "Not that I remember." RP at 702. Asked if he had told a defense investigator that he saw his mother hold the gun, he said he did not recall that either. After listening to a recording of his interview by that investigator outside the presence of the jury, however, Porter testified that he now recalled that he told the investigator he saw his mother hold the gun and hand it to Mr. Malotte sometime after November 20—but he could still not recall his mother doing that.

Porter testified that Mr. Griffith's truck stayed outside their house for a few days and Mr. Malotte went into it; Porter was pretty sure Delilah did too. He testified that Ms. Hamilton knew Delilah and Mr. Malotte had gone through the truck. Porter was aware straps were missing from Mr. Griffith's truck and saw some in the house, although he was not sure if they were Mr. Griffith's.

Porter described the layout of the upstairs of Ms. Hamilton's home, where everyone slept. He and Ms. Hamilton each had a bedroom. Neither bedroom had a door. The area outside their rooms was described as a loft, and was where Delilah and Mr. Malotte slept. Porter acknowledged that to get to his own room and Ms. Hamilton's, one had to walk through that area.

Porter testified that the clothes the assault rifle was found on during execution of the search warrant were his. He was surprised when he saw the officer's picture of where the rifle was found, which he agreed was in the area of the loft near his door. While the rifle was often left in the loft, he testified it was usually closer to where Delilah and

Shane slept. He testified that everyone who lived in the house had access to the entire house and no areas were locked or off limits. Porter said they "always went in each other's rooms." RP at 548.

Porter testified that his mother's home was located on 10 acres and the family had chickens, two cows, two goats, two rabbits, and dogs. Everyone helped take care of the animals. Water tanks were located in the double-doored storage area. Some were for drinking and eating and others were for watering the animals. The animals had to be given water every day.

Ms. Hamilton did not call any witnesses.

The jury found Ms. Hamilton guilty as charged. A motion to arrest judgment on the third and fourth charges on the basis of insufficient evidence was denied. Ms. Hamilton appeals.

ANALYSIS

Ms. Hamilton's assignments of error challenge the sufficiency of the evidence to support her four convictions.

Due process requires the State to prove all elements of a crime beyond a reasonable doubt. *State v. Washington*, 135 Wn. App. 42, 48, 143 P.3d 606 (2006). The test for sufficiency of the evidence is "whether, after viewing the evidence in the light most favorable to the State, any rational trier of fact could have found guilt beyond a reasonable doubt." *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992). All

reasonable inferences from the evidence are drawn in favor of the State and are interpreted most strongly against the defendant. *Id.* "Credibility determinations are for the trier of fact and are not subject to review." *State v. Mines*, 163 Wn.2d 387, 391, 179 P.3d 835 (2008).

We address Ms. Hamilton's assignments of error in the order presented.

I.       FIRST DEGREE RENDERING CRIMINAL ASSISTANCE

Ms. Hamilton challenges the sufficiency of the evidence to support her conviction for first degree rendering criminal assistance on two grounds: first, that the State did not present substantial evidence that she knew Mr. Malotte had committed or was being sought for *first degree* assault; and second, that the only evidence of her assistance advanced by the State was not evidence of an affirmative act or statement.

A.       Substantial evidence supports the essential element that Ms. Hamilton knew that Mr. Malotte committed or was being sought for the crime of assault

The Washington Criminal Code recognizes three degrees of the crime of rendering criminal assistance. As relevant here, it defines "renders criminal assistance" as comprising six types of assistance rendered "with intent to prevent, hinder, or delay the apprehension or prosecution of another person" who the accused "knows has committed *a crime . . .* or is being sought by law enforcement officials for the commission of *a crime.*" RCW 9A.76.050 (emphasis added). By the statute's plain language, the knowledge required to constitute rendering criminal assistance is knowledge of the

13

assisted person's commission of "a crime" or that the assisted person is being sought for commission of "a crime."

The seriousness of the crime the assisted person has committed dictates whether a defendant's assistance is first, second, or third degree rendering criminal assistance. RCW 9A.76.070(1) provides that "[a] person is guilty of rendering criminal assistance in the first degree if he or she renders criminal assistance to a person who has committed or is being sought for murder in the first degree or any class A felony or equivalent juvenile offense." By this statute's plain language, it does not require the State to prove that the defendant *knew* the person being assisted had committed or was being sought for, e.g., a class A felony.

For purposes of instructing the jury in this case on the knowledge element of first degree rendering criminal assistance, the State cited *State v. Anderson*, 63 Wn. App. 257, 818 P.2d 40 (1991), for the proposition that Ms. Hamilton need not know of the degree of assault that Mr. Malotte committed or for which he was wanted, but only that it was assault. Defense counsel persuaded the trial court otherwise. The court instructed the jury that to convict, the elements that must be proved beyond a reasonable doubt included:

> (1) That on or about November 25, 2018, the defendant rendered criminal assistance to a person;
> (2) That the person had committed or was being sought for Assault in the First Degree; [and]

(3) That the defendant knew that the person had committed or was being sought for Assault in the First Degree.

Clerk's Papers (CP) at 148. The State made a timely objection and took exception to the instruction.

In *Anderson*, the defendant was convicted of first degree rendering criminal assistance based on evidence he drove a companion away from the scene of a robbery, having been told by the companion that he had just robbed a store. 63 Wn. App. at 258. Anderson argued on appeal that while it turned out his companion brandished an apparent firearm during the robbery, there was no evidence Anderson knew of the ersatz firearm or that it elevated the robbery to a class A felony. He argued that "a person must know that a class A felony has been committed before he or she can be guilty of rendering criminal assistance in the first degree." *Id.* at 259.

This court rejected the argument and held, based on the plain language of RCW 9A.76.050 and .070, that

> a person can be convicted of rendering criminal assistance in the first degree if he or she knows at the time of rendering the assistance that the one being assisted committed robbery. We further hold that a person can be convicted of rendering criminal assistance in the first degree notwithstanding a lack of knowledge concerning facts that would disclose the degree of the robbery.

*Anderson*, 63 Wn. App. at 260.

The court analogized rendering criminal assistance to accomplice liability, observing, "An accomplice is liable because he or she knowingly aids the criminal

enterprise of another before the fact," while "[o]ne who renders criminal assistance is liable because he or she knowingly aids the criminal enterprise of another after the fact." *Id.* at 261. It reasoned that "[b]ecause the goal in both cases is to punish for knowingly aiding the criminal enterprise of another, there is no reason to require that the renderer have more specific knowledge than the accomplice." *Id.* at 261. General knowledge of the crime is enough for accomplice liability, the court observed. *Id.* (citing *State v. Davis*, 101 Wn.2d 654, 658-59, 682 P.2d 883 (1984); *and see In re Pers. Restraint of Sarausad*, 109 Wn. App. 824, 836, 39 P.3d 308 (2001) (accomplice liability attached if defendant knew he was facilitating even a simple, misdemeanor-level assault).

Ms. Hamilton does not address *Anderson.* She takes the position that right or wrong, the elements instruction given in her trial is "law of the case" for the purpose of our sufficiency analysis. But as stated in *State v. Hickman*, it is "jury instructions *not objected to* become the law of the case." 135 Wn.2d 97, 102, 954 P.2d 900 (1998) (emphasis added). *Hickman* did not explain why an objection made in the trial court makes a difference, but we can glean why it makes a difference from *State v. Johnson*, in which our Supreme Court considered whether the United States Supreme Court's decision in *Musacchio v. United States*, 577 U.S. 237, 136 S. Ct. 709, 193 L. Ed. 2d 639 (2016), superseded Washington's "law of the case" doctrine. 188 Wn.2d 742, 756, 399 P.3d 507 (2017).

The United States Supreme Court held in *Musacchio* that when a jury instruction adds an element to a charged crime and the government fails to object, "a sufficiency challenge should be assessed against the elements of the charged crime, not against the erroneously heightened command in the jury instruction."  577 U.S. at 243.  This flows, the Court held,

> from the nature of a court's task in evaluating a sufficiency-of-the-evidence challenge.  Sufficiency review essentially addresses whether "the government's case was so lacking that it should not have even been submitted to the jury." *Burks v. United States*, 437 U.S. 1, 16, 98 S. Ct. 2141, 57 L. Ed. 2d 1 (1978) (emphasis deleted).  On sufficiency review, a reviewing court makes a limited inquiry tailored to ensure that a defendant receives the minimum that due process requires: a "meaningful opportunity to defend" against the charge against him and a jury finding of guilt "beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 314-315, 99 S. Ct. 2781, 61 L. Ed. 2d 560 (1979).  The reviewing court considers only the "legal" question "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.*, at 319, 99 S. Ct. 2781 (emphasis in original). . . .
>   A reviewing court's limited determination on sufficiency review thus does not rest on how the jury was instructed.

*Id.*

As *Johnson* explained, the aspect of Washington's "law of the case" doctrine dealing with unobjected-to jury instructions falls within a category that *Musacchio* observed *can* constrain an appellate court's review of a matter: doctrines such as waiver, forfeiture, and estoppel.  188 Wn.2d at 761 (citing *Musacchio*, 577 U.S. at 245).  "Specifically," *Johnson* states, "the doctrine is premised on the procedural rule that

17

'"before error can be claimed on the basis of a jury instruction given by the trial court, an appellant must first show that an exception was taken to that instruction."'" *Id.* (emphasis omitted) (quoting *State v. Salas*, 127 Wn.2d 173, 181, 897 P.2d 1246 (1995) (quoting, in turn, *State v. Bailey*, 114 Wn.2d 340, 345, 787 P.2d 1378 (1990))).

Accordingly, because the State can show in Ms. Hamilton's case that it took exception to the elements instruction, neither due process nor a failure to preserve error requires us to assess her sufficiency challenge against the instructions' erroneously heightened charge. We assess it instead against the elements of the charged crime.

Ms. Hamilton acknowledges that Deputy Kersten testified he "told her he was looking for the person who assaulted Griffith and the person he alleged shot at him." Br. of Appellant at 16. She contests only the sufficiency of evidence to prove that she knew Mr. Malotte committed or was being sought for a class A felony.

The evidence of first degree rendering criminal assistance was sufficient.

B.     There was sufficient evidence of affirmative acts or statements

Ms. Hamilton also contends that for a defendant to be guilty of rendering criminal assistance, she or he "must take affirmative acts or make affirmative statements, with the intent to conceal or harbor a felony offender from law enforcement." Supp. Br. of Appellant at 4 (citing *State v. Pringle*, 147 Wash. 555, 266 P. 196 (1928) and *State v. Budik*, 173 Wn.2d 727, 272 P.3d 816 (2012)). Of the six types of assistance that can

constitute criminally rendering assistance, the jury in Ms. Hamilton's case was instructed

on two: that a defendant

- harbors or conceals such person; or
- prevents or obstructs, by use of deception, anyone from performing an act that might aid in the discovery or apprehension of such person.

CP at 146.

It is well settled that a defendant cannot be guilty of rendering criminal assistance

if she does nothing more than falsely disavow information. In *Budik*, the defendant was

charged with rendering criminal assistance. The means charged was using deception that

prevented or obstructed performance of an act that might have aided in discovery or

apprehension of the wanted person. While our Supreme Court acknowledged that the

term "deception" used in RCW 9A.76.050 may literally include false disavowals, it was

properly construed as requiring more: it "requires an affirmative act or statement."

*Budik*, 173 Wn.2d at 737. It relied for this construction on the statutory treatment of

obstructing justice as a whole, other types of assistance criminalized by the statute, the

statute's history, and case law from other jurisdictions interpreting the crime of serving as

an accessory after the fact. *Id.* at 735-37. The court observed that this construction also

conformed to its holding in *State v. Williams*, 171 Wn.2d 474, 483-84, 251 P.3d 877

(2011), that statutes criminalizing false statements to law enforcement implicate

constitutional guaranties of speech and privacy and must be narrowly construed. *Budik*,

173 Wn.2d at 737.

19

False disavowals can go hand in hand with affirmatively misleading statements, however, as illustrated by *State v. Mollet*, 181 Wn. App. 701, 707, 326 P.3d 851 (2014). Megan Mollet was the front seat passenger in a truck being driven by Joshua Blake when a highway patrol trooper stopped the truck just after midnight and was shot and killed by Blake. *Id.* at 703. Officers located Blake's truck abandoned in a field of tall grass on a property and cleared six people from two houses on the property, one being Mollett; Blake had arranged to be taken elsewhere. *Id.* at 704. Mollet told officers she did not know Blake and did not know anything about anybody shooting an officer. *Id.* at 710. She told both officers that she had spent most of the prior day helping a friend move; she told one officer she didn't arrive home until 1:00 a.m. and another that she arrived home at 11:00 p.m. but went straight to bed. *Id.* She was charged and convicted of first degree rendering criminal assistance by concealing Blake, through false statements to police. *Id.* at 704-05.

On appeal, she relied on *Budik* to argue that because she only falsely disavowed knowledge, her conviction for rendering criminal assistance could not stand. While this court agreed that her statements about not knowing Blake or anything about the crime were mere disavowals,

> [her] false statements that she was helping a friend move that night and that she did not see Blake at the residence were not mere false denials of knowledge. Rather, they were affirmative statements that she had not been present at the shooting and that she had had the opportunity to observe but did not see anything at the Sidney Road property.

20

*Id.* at 710-11.

Ms. Hamilton, too, made affirmative misrepresentations. She continually represented to police that her connection to the man they were looking for was through Mr. Griffith and she believed the man lived with Mr. Griffith. On November 25, she reported that she was terrified because someone who looked like the friend of Mr. Griffith's who shot at Deputy Kersten had returned with Mr. Griffith to her property, and appeared to have a firearm. Jurors could reasonably infer that her false statements were calculated to shield Mr. Malotte by deflecting investigation away from her family and property. According to Deputy Kersten, it would have "substantially" changed the investigation if officers had known Mr. Malotte's true relationship with the Hamilton family. RP at 394. If Ms. Hamilton had denied knowing anything about the person who assaulted Mr. Griffith in her fenced yard, it could (indeed, likely would) be perceived as a refusal to cooperate and would not have deflected interest from her family and property.

Ms. Hamilton also argues that the State's evidence that she harbored or concealed Mr. Malotte fails because, as her trial lawyer argued in closing, Mr. Malotte was out in public between November 20 and his apprehension on November 29: he rode the Hamiltons' quad to and from the community bus stop and took the bus into town to shop and take showers. She relies on the 1928 decision in *Pringle*, in which our Supreme Court construed the statute then in place as requiring the defendant to do some affirmative act "toward[ ] hiding or keeping the person he is charged with concealing

21

from the public view," and found no evidence that the defendant in that case had tried to "hide or secrete" the wanted person. 147 Wash. at 558-59. As the State points out, however, *Pringle* was not applying the predecessor statute to RCW 9A.76.050—it was applying a different predecessor statute. In holding in *Pringle* that the "gist of the offense" it was applying "is concealment," the *Pringle* court distinguished the predecessor to the statute we are applying. 147 Wash. at 557. It characterized the predecessor to RCW 9A.76.050 as "covering the question of aiding, assisting, harboring, or in any way *other than by concealment*, helping such escaped prisoner." 147 Wash. at 557 (emphasis added).

"Harboring" is defined as "[t]he act of affording lodging, shelter, or refuge to a person, esp. a criminal or illegal alien." BLACK'S LAW DICTIONARY 860 (11th ed. 2019). The State's evidence that Ms. Hamilton was harboring Mr. Malotte was sufficient.

II.     POSSESSION OF A STOLEN FIREARM

Ms. Hamilton challenges the sufficiency of the evidence that she had constructive possession of the stolen Griffith rifle.

"A person is guilty of possessing a stolen firearm if he or she possesses, carries, delivers, sells, or is in control of a stolen firearm." RCW 9A.56.310(1). Possession can be actual or constructive. "Actual possession means that the goods are in the personal custody of the person charged with possession; whereas, constructive possession means that the goods are not in actual, physical possession, but that the person charged with

22

possession has dominion and control over the goods." *State v. Callahan*, 77 Wn.2d 27, 29, 459 P.2d 400 (1969).

Whether a defendant had dominion and control over an item turns on the totality of the circumstances. *State v. Alvarez*, 105 Wn. App 215, 221, 19 P.3d 485 (2001). The fact that a defendant has dominion and control over premises where an item is found is relevant. *State v. Echeverria*, 85 Wn. App. 777, 783, 934 P.2d 1214 (1997) (possession of a firearm). "'[T]he ability to reduce an object to actual possession' is an aspect of dominion and control, but 'other aspects such as physical proximity' should be considered as well." *State v. Chouinard*, 169 Wn. App. 895, 899, 282 P.3d 117 (2012) (alteration in original) (quoting *State v. Hagen*, 55 Wn. App. 494, 499, 781 P.2d 892 (1989)). Proximity alone is not sufficient to establish constructive possession, however. *Id.* (citing *State v. Raleigh*, 157 Wn. App. 728, 737, 238 P.3d 1211 (2010)). "And knowledge of the presence of contraband, without more, is insufficient to show dominion and control to establish constructive possession." *Id.*

In this case, evidence was presented that Ms. Hamilton possessed the premises and after being stolen, the rifle was continually kept at her home. Porter testified that Mr. Malotte carried the rifle into all areas of the house; when Mr. Malotte wasn't handling it, it would be "laying on the ground," generally in the loft area where Mr. Malotte and Delilah slept. RP at 569. That open area was in close proximity to Ms. Hamilton's bedroom, which had no door. On the day the search warrant was executed, it was even

closer to her bedroom; it was found next to a banister at the top of the stairs. The trial court observed when it denied a motion to arrest judgment on this count that not only was the rifle "in open plain view" in the home, but Ms. Hamilton "had to basically trip over it every day to get where she was going." RP at 958.

Ms. Hamilton discounts the importance of her possession of the premises, pointing to *State v. Davis*, in which our Supreme Court found that a homeowner, Letrecia Nelson, did not have possession of a firearm brought into her home. 182 Wn.2d 222, 340 P.3d 820 (2014) (plurality opinion). The visitor to Nelson's home was an acquaintance who, after being injured in a confrontation with police, demanded entry into her home to get a change of clothing and help treating his gunshot wound, and was there for only 15 minutes. *Id.* at 225, 228 (lead opinion). Justice Stephens, writing for the majority on this issue, observed that having dominion and control over the premises containing an item "does not, *by itself*, prove constructive possession. *Id.* at 234 (Stephens, J., dissenting) (emphasis added).

Significant to the court's decision that possession of the premises was not enough in Nelson's case was evidence that her injured, gun-bearing visitor "arrived . . . in an atmosphere of chaos . . . making demands for assistance, and admitting to killing four armed police officers." *Id.* at 235. There was evidence that he had a "tendency to be 'in control of his family members' and others" and a "reputation of being 'intimidating.'" *Id.* at 235. Whether Nelson was in a position to exercise dominion and control over her

24

visitor's gun, the court concluded, "must be considered in this context." *Id.* Given the circumstances, it concluded she had not been in a position during that chaotic 15 minutes to exercise dominion and control over his firearm.

Ms. Hamilton was not dealing with a fleeting, chaotic intrusion by someone so intimidating that no homeowner would risk acting on their access to the intruder's firearm. The evidence of her constructive possession of the rifle was sufficient.

III.    THIRD DEGREE POSSESSION OF STOLEN PROPERTY

Under RCW 9A.56.140(1), "[p]ossessing stolen property" means "knowingly to receive, retain, possess, conceal, or dispose of stolen property knowing that it has been stolen and to withhold or appropriate the same to the use of any person other than the true owner or person entitled thereto." Ms. Hamilton argues that with respect to the stolen snatch block, come-along, and tie straps, there was insufficient evidence that she possessed them or knew they were stolen.

The double-doored storage area, as a part of Ms. Hamilton's home, was in her dominion and control, as, presumptively, were the items in it. *Echeverria*, 85 Wn. App. at 783. The State presented evidence that the storage area was visited regularly by members of the household and daily by at least some of them, since that was where water needed for personal use and to care for their animals was located. There was also evidence that the doors were sometimes left open—they were on the day of the search— in which case the stolen items could be seen without even entering the storage area.

25

Viewed in the light most favorable to the State, the evidence supported an inference that Ms. Hamilton knew the items were in her home's storage area.

Porter testified to being present when Delilah and Mr. Malotte talked to Ms. Hamilton about the fact that they were going through stuff in Mr. Griffith's truck. Ms. Hamilton was present on the night of the assault and would have seen items strewn around the truck that were no longer there a few days later. During the same time frame, the new items appeared in the storage area. Here, too, the evidence supported the inference that she knew the new items were stolen.

IV.    MAKING A FALSE AND MISLEADING STATEMENT

Finally, Ms. Hamilton argues that her statements on November 20 that "[Mr.] Malotte *might be* or *could be* at Griffith's home" were not "definitive" and cannot support her conviction for making a false or misleading statement to a public servant. Br. of Appellant at 25-26. The State responds that Ms. Hamilton made additional false and misleading statements, and that all of them support her conviction on this count.

"A person who knowingly makes a false or misleading material statement to a public servant is guilty of a gross misdemeanor. "'Material statement' means a written or oral statement reasonably likely to be relied upon by a public servant in the discharge of his or her official powers or duties." RCW 9A.76.175. The statute does not require actual reliance on the statement by an official. *State v. Godsey*, 131 Wn. App. 278, 291, 127 P.3d 11 (2006). While a conviction for rendering criminal assistance stemming from

26

deceptive statements to a police officer requires an affirmative act or statement, providing a false or misleading statement under RCW 9A.76.175 does not. *Mollet*, 181 Wn. App. at 707.

Ms. Hamilton first argues that "reluctance" on her part to provide definitive information to the deputies does not make her statements false or misleading. Br. of Appellant at 26. There is no evidence she was reluctant, but if she was, it would not make her statements true or *not* misleading.

Viewing the evidence in the light most favorable to the State, the jury could reasonably have found all of the following statements by Ms. Hamilton to be false and misleading: that she didn't know the fleeing man, that he was a friend of Mr. Griffith, that he might be living with Mr. Griffith,[2] and that his name was Shane, Shawn, Michael or a fourth name (Cameron or Jesse). Telling the deputy that the fleeing man "might" be living with Mr. Griffith does not absolve her of guilt; the jury could find the statement was knowingly false if she knew Mr. Malotte was not living there.

As for the required reasonable likelihood that the deputies would rely on Ms. Hamilton's statements, they demonstrably did. Proving their actual reliance was not required, but the first step they took after leaving the Hamilton property was to travel to

---

[2] Ms. Hamilton characterizes Deputy Kersten as testifying that she said only that the fleeing suspect "might be" at the Griffith house, but the State presented evidence that this was in the context of discussing where he was living. *See* RP at 307.

the Griffith property and assess whether they could safely approach in search of their suspect. And it was foreseeable that they would rely on Ms. Hamilton's statements by focusing their further investigation on Mr. Griffith's connections. As previously observed, had Ms. Hamilton not seemingly cooperated and pointed the deputies in the wrong direction, their focus would likely have remained on the Hamilton family members and property.

Here again, the evidence was sufficient.

## STATEMENT OF ADDITIONAL GROUNDS

Ms. Hamilton filed a pro se SAG in which she includes over 20 grounds.

The Rules of Appellate Procedure permit the defendant in a criminal case on direct appeal to file a SAG, to identify and discuss matters the defendant believes have not been adequately addressed by the brief filed by her or his appellate counsel. RAP 10.10(a).

We will consider only arguments that were *not* addressed by counsel's briefing. RAP 10.10(a). Challenges to the sufficiency of the evidence to sustain Ms. Hamilton's convictions were adequately briefed and are rejected for reasons already discussed. Ms. Hamilton's SAG adds nothing of merit on those issues and need not be addressed.

Issues that turn on facts that are not reflected in the record cannot be resolved in the direct appeal and are properly raised through a personal restraint petition (PRP), where they must be supported by admissible evidence. *State v. Calvin*, 176 Wn. App. 1, 26, 316 P.3d 496 (2013). Almost all of Ms. Hamilton's claims of ineffective assistance

28

of her trial counsel fall into this category. Also falling into this category is her complaint that jurors slept during the trial, since the record created by the trial court suggests otherwise. Ms. Hamilton is cautioned that to establish ineffective assistance of counsel, she will need to demonstrate not only deficient representation, but also that she was actually prejudiced.

Alleged errors that were not raised in the trial court are unpreserved and generally will not be reviewed for the first time on appeal. RAP 2.5(a). Examples are Ms. Hamilton's contention that she should have received a change of venue, since no motion for a venue change was made below; her complaint about the exclusion of criminal history on the part of Mr. Griffith that the lawyers agreed was inadmissible; a failure to redact the identity of her prescribed medications from photographs used to establish her dominion and control of areas in the home; and the prosecutor's questioning of Porter about whether some of Mr. Griffith's behavior was joking. If Ms. Hamilton believes these issues resulted from ineffective assistance of counsel, she needs to demonstrate the ineffective assistance in a PRP.

We will not consider a defendant's SAG for review if it does not inform the court of the nature and occurrence of alleged errors. RAP 10.10(c); *State v. Bluehorse*, 159 Wn. App. 410, 436, 248 P.3d 537 (2011). An appellate court is not required to search the record in support of claims made in the SAG. RAP 10.10(c). Ms. Hamilton speaks of a "speedy trial" issue, but she does not identify facts that would raise a rule-based time to

trial violation, let alone a constitutional one.  Her principal concern is that she wanted a pending animal cruelty prosecution to be tried first, but she fails to articulate a legal right to trials being conducted in her preferred order.

Complaints about attorney performance cannot be entertained if the attorney's conduct "can be characterized as legitimate trial strategy or tactics."  *State v. McNeal*, 145 Wn.2d 352, 362, 37 P.3d 280 (2002).  Falling into this category are complaints that her trial lawyer failed to present evidence that was inadmissible (e.g., an investigator's report, which would have been hearsay; testimony from Delilah and Mr. Malotte, who the court was told would refuse to testify, given charges pending against them; evidence of Mr. Griffith's criminal history) or that was irrelevant (signage on her property saying she was not liable for lost or stolen property).

We do not review complaints for which no relief can be granted, such as Ms. Hamilton's complaints about the first degree assault charge that the State voluntarily dismissed, law enforcement's alleged failure to procure a no-contact order for her against Mr. Griffith, and her receipt of only one offer of a plea deal—an offer she found unacceptable.

The only ground raised by Ms. Hamilton that warrants review is her complaint that the trial court too summarily rejected her requests for replacement of her court-appointed trial lawyer.  On three occasions before trial, Ms. Hamilton requested a new attorney. The first was at a time when the trial court was ordering an evaluation of her competency

and she accused *her lawyer* of being incompetent.  The court reasonably ruled that the evaluation should be completed first and "if this continues to be a problem in your mind, . . . we'll take another look at it."  RP at 8.  It did tell Ms. Hamilton that her trial lawyer was a "very experienced, well-respected trial attorney."  RP at 7.

The second request was after she had been found competent to stand trial and, when returned to court to enter a plea, told the court that she wanted to fire her trial lawyer for incompetence, for coercing her, and for talking to the officers involved about her case.  RP at 16.  The trial court again observed that her lawyer was "a very experienced defense attorney," so the court needed to know her reasons more specifically.  RP at 17.  She was told to put her concerns in writing "and we'll talk about it."  *Id.*

The third request was at a status hearing presided at by a different judge.  Ms. Hamilton evidently had not filed a written motion as directed, but the court heard from her anyway.  She said that she and her lawyer did not "see eye to eye" and

> My feeling about it is I haven't even gone over the case with him.  I haven't seen pictures or recordings or anything and he's having a hard time returning my phone calls and I also have him coercing me on a tape too.

RP at 34.

When invited to respond, defense counsel said he had never coerced a client to accept a guilty plea and invited the trial court to listen to the tape recording.  He told the court he had merely told Ms. Hamilton, with respect to a separate, pending prosecution

31

for animal cruelty, that it did not appear that she was guilty of first degree animal cruelty but before he could say whether she might be guilty of a separate or lesser included charge, he needed to see the scene (it was not then possible, due to snow) and do further research.

Ms. Hamilton added that the lawyer had not listened to a tape she wanted him to hear or look at a text she wanted him to see. The lawyer responded that the problem with their communication was that Ms. Hamilton had her own ideas, but did not understand the law or court rules and refused to listen to him. The trial judge sought to explain to Ms. Hamilton how, in his view, her lawyer was simply doing his job and she should listen to him. He, too, reassured her that her lawyer was an "extremely well-respected attorney." RP at 36.

Ms. Hamilton points to no other occasion, in later status conferences or at trial, that she renewed her request for replacement counsel.

Defendants do not have an absolute right to the counsel of their choice. When a motion for new counsel is made—and we note that Ms. Hamilton never prepared a written motion, although directed to do so—courts are required to grant it only "when counsel and defendant are so at odds as to prevent presentation of an adequate defense." *State v. Stenson*, 132 Wn.2d 668, 734, 940 P.2d 1239 (1997) (*Stenson* I). A defendant "must show good cause to warrant substitution of counsel, such as a conflict of interest, an irreconcilable conflict, or a complete breakdown in communication between the

attorney and the defendant." *Id.* Courts consider "(1) the extent of the conflict, (2) the adequacy of the inquiry, and (3) the timeliness of the motion." *In re Pers. Restraint of Stenson*, 142 Wn.2d 710, 724, 16 P.3d 1 (2001) (*Stenson* II).

Most important here is the nature and the extent of the breakdown in communication. *Id.* at 730. "The general loss of confidence or trust alone is not sufficient to substitute new counsel." *Stenson* I, 132 Wn.2d at 734. Our Supreme Court found no irreconcilable differences where a defendant was: "afraid to proceed with his counsel," his attorney told the lower court that they no longer had an attorney-client relationship, and he could not stand the sight of the defendant, because that disagreement was short lived and they were able to communicate. *Stenson* II, 142 Wn.2d at 729-31. The court also commented that the disagreement was not comparable to federal cases finding irreconcilable differences and "the effects of any breakdown in communication on attorney performance seem negligible." *Id.* at 729. We review the denial of a motion for new counsel for abuse of discretion. *Id.* at 723.

Ms. Hamilton did not view the issue as important enough to prepare a written motion, as directed. At each appearance in our record, defense counsel was prepared and from all appearances was working diligently and competently on Ms. Hamilton's defense. Her own exchanges with the court tended to confirm her lawyer's report that she had her own ideas about tactical decisions that were his province, and sometimes preferred her ideas over listening to his advice. There was no evidence of a conflict of

33

interest, nor was there the appearance of irreconcilable differences or a complete breakdown in communication. No abuse of discretion is shown in failing to grant or take further action on Ms. Hamilton's informal, undocumented, request for replacement.

Affirmed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Siddoway, A.C.J.

WE CONCUR:

_____
Fearing, J.

_____
Staab, J.